MRS. MARY MACKIE et al. v. L. A. FUQUA.

Middle Section. November 21, 1931.

Petition for Certiorari denied by Supreme Court, March 5, 1932.

Worth Bryant and E. A. Langford, both of Cookeville, for appellant, Mrs. Mackie.

H. B. McGinness, of Carthage, for appellee, L. A. Fuqua.

CROWNOVER, J. Complainant, Mrs. Mackie, by her next friend, Danie Mackie, filed a bill in the Chancery Court against L. A. Fuqua, to have rescinded and set aside a deed executed by her to Fuqua, on the grounds that she was of unsound mind when she executed the deed; that its execution was procured by fraud and misrepresentation and undue influence; and that the purchase price was grossly inadequate.

Defendant answered and denied the allegations of the bill as to fraud, misrepresentation and undue influence, and as to the mental incapacity of complainant.

The cause was tried by the Chancellor and a jury. Three issues of fact were submitted to the jury:

(1) Was the complainant, Mary Mackie, at the time of the execution of the deed in question a person of feeble mind and weak understanding, and an easy victim of fraud?

(2) Was the execution of the deed in controversy procured by the defendant Fuqua by fraud, imposition, or undue influence?

(3) Was the purchase price paid by the defendant Fuqua grossly inadequate?

At the close of complainant's proof and again at the conclusion of all the proof the defendant moved the court to direct the jury to answer "no" to each of the issues submitted, which motions were overruled by the court.

The jury answered "no" to the first interrogatory and "yes" to the second and third.

Whereupon the defendant moved the court to render a decree in his favor, and to dismiss complainant's bill upon the foregoing verdict of the jury, upon the ground that the verdict in his favor upon Issue No. 1 was determinative of the suit, in that complainant's bill was based solely upon mental incapacity of complainant, hence there was no equity upon the face of the bill, which motion was sustained by the court. It was accordingly adjudged and decreed by the court that complainant's bill should be dismissed and the injunction dissolved.

Whereupon complainant moved the court to correct the decree dismissing complainant's bill, and for a decree upon the verdict, and that the deed be rescinded, set aside and canceled, which motion was overruled by the Chancellor. To all of which action of the court complainant excepted and has appealed to this court.

Complainant, Mrs. Mackie, did not make a motion for a new trial but prayed and obtained a straight appeal. It was not necessary for her to make a motion for a new trial as she was satisfied with the verdict of the jury and insisted that the Chancellor should have rendered a decree in her favor upon the verdict of the jury on the second and third issues. An objection that the judgment does not follow the verdict cannot be raised by a motion for a new trial. 46 C. J., 101, sec. 64.

Complainant assigned as error the court's action:

(1) In holding that there was no evidence to support the verdict of the jury on the last two issues.

(2) In failing to enter judgment in her favor on the verdict of the jury.

(3) In sustaining a motion for a directed verdict after the jury was discharged.

Mrs. Mary Mackie was, at the time of the execution of the deed, sixty-four years of age and illiterate. She had been engaged in business as a merchant for a number of years. She was the owner of about six acres of land in the town of Cookeville, near the depot, on which were located three dwellings, a store and a filling station. Some of this property she had paid for out of the profits of her business, and some of it she had received from her husband. She was a widow and had five grown children, several of whom resided in Cookeville. She was on bad terms with one of her daughters, Mrs. Notie Reid.

She contemplated selling all of her property in Cookeville except her home and the house in which her son Danie Mackie lived and going to Boulder Dam, Colorado, with the intention of operating a hotel there. M. P. King, an auctioneer, hearing that she wanted to sell her property above mentioned, called on her and

entered into a contract to sell it at auction, she to pay him a commission on the sale of ten per cent on the improved property and fifteen per cent on the unimproved. King had the property surveyed and laid off in lots, and advertised the auction.

About a week before the auction sale, the defendant, L. A. Fuqua, called on Mrs. Mackie and offered to buy her property. He offered her $5000 cash for it, which she refused, telling him that that was less than half of what it was worth. He called on her a number of times and undertook to show her the advantage of selling for cash. He told her she was making a mistake to sell her property at auction at that time; that he was a man of large experience in dealing in real estate and able to advise her; that the purchasers on long time notes would fail to pay the notes when due and ask for an extension of time; that if she foreclosed they had two years in which to redeem, so she would be deprived of her money for years; that if the houses should be destroyed by fire she would have nothing but the vacant lots; that if she was going to Boulder Dam, where there were wonderful opportunities, it was necessary for her to have cash to invest; that she wouldn't get any cash from the auction sale, as the cash paid in would be appropriated by King for his commission.

Several days later, on Saturday evening, before the Monday on which the auction was to be held, King, the auctioneer, called on her and told her that he had heard the sale would be enjoined on Monday; that an injunction would frighten off bidders who had money; that an injunction would tie up her property for one or two years; and that she wouldn't be able to get another real estate man to handle the property if the sale should be enjoined. He told her that he had a man who would pay $5000 in cash for the property. After several trips of King's between the prospective purchaser and Mrs. Mackie, and some discussion, it was agreed that the purchaser should pay her $5000 cash and pay King's commissions. King then took her in his automobile and drove out towards the country. When they had gone several miles they saw an automobile parked beside the road, and they stopped. Defendant Fuqua was the occupant of that automobile. King spoke to him and the two cars were then driven into a side road to the home of a lawyer, Mr. Bullington. There Mr. Bullington prepared the deed, and Mrs. Mackie executed it by making her mark.

Fuqua deducted from the $5000 purchase price $800 to cover a mortgage on one of the lots, $60 interest on the mortgage, and $7.53 for fees for probating and recording the deed, and gave Mrs. Mackie his check for $4132.47.

After the execution of the deed King drove Mrs. Mackie back to her home but charged her not to tell her children or anyone

about the execution of the deed, and told, her to cash the check early Monday morning, and get the money, which he advised her to deposit in some bank away from Cookeville. She asked him if she should deposit it in a bank at Sparta and he advised her to carry it further away.

On the following Monday morning defendant Fuqua filed the deed for registration but instructed the register not to tell anyone about it.

Mrs. Mackie deposited Fuqua's check in the First National Bank at Cookeville on Monday morning.

It was agreed between Fuqua and King that the auction should proceed in the name of Mrs. Mackie. King went about town and urged people to come and bid on the property, telling them that there would be no by-bidders and that there would be a shower of money as advertised. When the time for the auction arrived several people were on the scene. King proceeded with the auction by throwing out some money, most of which was obtained by Fuqua, and the unimproved lots were put up to the highest bidder. All of them were bid in by Fuqua, with the exception of three lots, and the unimproved property was sold for $3875. Fuqua had instructed King not to sell the improved property which had houses and other improvements on it, and it was valued by them at $4200, making the value of all the property conveyed by Mrs. Mackie to Fuqua $8075.

Mrs. Mackie has since paid said $800 mortgage and interest, and has raised the question that she should not have been required to pay the fees for probating and recording the deed. L. A. Fuqua sent her a check to cover the mortgage, interest and probate and recording fees, but she refused to accept it. Fuqua then offered to reconvey the property to her if she would pay the amount he had been caused to expend on account of the auction sale and his expenses, which she refused to accept.

We are of the opinion that the first and second assignments of errors should be sustained, as there is evidence to support the verdict on the last two issues; and that the Chancellor erred in disregarding the verdict of the jury, and in sustaining defendant's motion to dismiss the bill for want of equity on its face.

The proof is that King and Mrs. Mackie had the following conversation, which caused Mrs. Mackie to execute the deed:

"He said, 'Have you heard anything?' and I said 'No, I hadn't heard a thing,' and he said 'From the appearance of everything and from what he could learn we are going to be enjoined Monday,' and I asked him who was going to enjoin me, and he said Reids, said they was at the outs with me about that note, and said they would do anything to keep me from selling my property, said they wanted me to stay here, thinking

I might die and they would get the property, and he said, 'I have it sold if you will take $5000 and pay the commission,' and I said, 'That just goes in one ear and out the other, let them enjoin it.' He said he had a lot of monied men coming to bid on it and he said they will hear this rumor that it is going to be enjoined and they won't be here, and he said these little one horse fellows haven't got any money. I said 'You heard Danie say this evening that he hadn't heard Reids say one word about it, and you said you hadn't heard anything.' He says, 'I am working for your interest, I believe you will make money by taking $5000 and pay my commission.' And I told him I would never do it, so he went on off, and I went back in the house and finished putting supper on the table, and we eat and McClean went back to the davenport and started reading again and I piled up the dishes where we eat, and in a minute or two Harry said, 'Grandmother, somebody wants you at the door,' and I went to the door, and it was Mr. King again, I asked him to come in and he said, 'Walk out here a minute I want to see you again,' and I went out, and he said, 'I have been back and seen that fellow and by hard pleading I got him to agree to give you $5000 and split the difference on the commission.' I said, 'I had rather call the sale off, you know that is less than half the worth of my property,' and he says, 'You have gone so far with it you can't do that.' He said real estate men wouldn't take hold of it any more, he says, 'It costs real estate men quite a bit of money to get property ready for sale.' He says, 'I am a friend to you, and working for your interest, and I will be honest with you, the cash right in your hand is better than having to fool with notes, and it is not going to bring much.' And he says, 'You have made arrangements to go out yonder and if you sell for cash you are not going to have any notes to bother you.' And he said, 'They are just doing this to knock you out of going out yonder, they think if you sell it you will run through with the money and they won't get anything, but if they can keep you here, they think maybe you will die and they will get it at your death.' I said, 'How long would an injunction tie it up?' and he said one or two years. I said, 'Well, if you think I can't sell it any more, and think they are doing this to keep me from going out yonder, and if we are going to be enjoined, I will just do that.'"

She stated further on in her testimony that King stated on his second visit, "You sure will be enjoined," and will not be able to dispose of the property.

It is insisted that King was not Fuqua's agent but that he was the agent of Mrs. Mackie, and therefore any misrepresentations that King made about the injunction suit would not be binding on Fuqua for the reason that Fuqua knew nothing about it and did not authorize such statements. But after an examination of the record we are of the opinion that King was acting as agent for Fuqua. King had an .agreement to subdivide and auction this property for Mrs. Mackie, but he had no contract to sell the property as a whole at a private sale. He met Fuqua on that Saturday afternoon after Fuqua had tried to buy the property from Mrs. Mackie. After some conversation between them Fuqua proposed to buy it for $5000 cash, which proposition King conveyed to Mrs. Mackie, and that she should pay King's commission, which she refused. Fuqua was stationed over at a garage near by and King went again and communicated with Fuqua, who made another proposition that he would pay half of the commission, but Mrs. Mackie refused this proposition. King conferred with Fuqua again and he then proposed to pay her $5000 in cash and to pay King's commission. This proposition was communicated to Mrs. Mackie by King, who urged her to accept it, stating that she "sure would be enjoined" and her property would be tied up for two or three years and that she would not be able to sell it at all as moneyed men would not bid on it with the prospect of an injunction suit and other real estate men would not take up the matter of a sale in the future. He had previously told her that the property was worth $8000 to $10,-000 and he thought he would obtain that much, but on this occasion he strongly urged her to accept the $5000 for the reasons stated. We think the proof shows, and that the jury was warranted in finding, that King was Fuqua's agent, as the proposition for a private sale was made by Fuqua to him to be communicated to Mrs. Mackie, and Fuqua actually paid King for his services. Agency was a question for the jury. 1 Mechem on Agency (2 Ed.), sec. 300; 2 C. J. 964, sec. 734.

After the deed was acknowledged at Mr. Bullington's home King said: " 'Fuqua give me my check for $420,' and Fuqua said he didn't owe him any $420, and King said, 'You wouldn't deny that, would you Mr. Fuqua? You know you said if I could make this deal with Mrs. Mackie that you would write me a check.' "

From the foregoing it appears that Mrs. Mackie was induced to execute this deed by the greatly exaggerated statements of King, which amounted to false representations, and that King was acting as the agent of Fuqua in bringing about the sale.

> "It is of no consequence, so far as the result is concerned, that this vendee had no personal connection with this purchase. What she did by her agent she did by herself in legal

contemplation. His acts, for the purpose of this litigation, are imputable to her in the fullest sense. She cannot deny legal responsibility for those acts and at the same time hold the fruits of them.'' Stephens v. Ozbourne, 107 Tenn., 578, 64 S. W., 902.

It matters not that Fuqua had not heard of the supposed injunction proceeding until after the sale. Where King, the agent, was authorized to buy the property for him, he is liable for the misrepresentations made by King to induce Mrs. Mackie to sell the property.

"The fraud of an authorized agent will avoid a contract entered into by him in behalf of his principal. Although such misrepresentation may not be authorized by the principal, yet, if he ratify the contract, he will be bound thereby, for he cannot make the contract his own by availing himself of its benefits, and at the same time avoid responsibility for the fraud upon which it is founded.'' Franklin v. Ezell, 1 Sneed, 496.

It is argued for defendant that the proof does not conform to the allegations of the bill; that complainant's bill alleges that complainant is a person of unsound mind and as such was imposed upon and defrauded by defendant, and relies on this ground solely for relief, therefore the verdict of the jury finding the complainant to be a person of sound mind is determinative of the cause of action, no character of fraud being alleged in the bill that would operate to invalidate the contract or deed of a person of sound mind. It is further argued that the bill does not charge that King was the agent of Fuqua or that there was a conspiracy between Fuqua and King to defraud Mrs. Mackie.

The original bill in this cause alleges that complainant was feeble in body and mind and that she was by fraud and misrepresentation induced to execute the deed. The facts which constituted this fraud are alleged to be that Fuqua represented to her that she would have trouble collecting her notes if she sold the property at auction on deferred payment plan and that it would be much better to sell for cash; that King and Fuqua represented to her that the sale would be enjoined by her enemies.

King said: ''You sure will be enjoined'' and your property tied up for two or three years. This caused her to execute the deed. This statement was untrue or greatly exaggerated, and he had no information that warranted such statements. King says that complainant's son, Danie Mackie, had told him that some of the other heirs might enjoin the sale. Danie Mackie says that he told King that he would not enjoin the sale but he did not know what the other children might do about it. This was no information upon

which to base the statement to Mrs. Mackie, "You sure will be enjoined."

The bill further charges that Fuqua was "aided and abetted by his confederate, King, who readily entered into the plan and scheme of this defendant."

We are of the opinion that this statement in the bill was sufficient to charge that King was the agent of Fuqua and confederated or conspired with him in his scheme to purchase this property for half of what it was worth.

We are of the opinion that the bill alleged that the deed was procured by fraud, and does not merely allege that it was procured by imposition upon a person of unsound mind; and that it further alleged facts sufficient to show that King was the agent of Fuqua in perpetrating the fraud.

Fraud must be distinctly alleged and the circumstances should be set out in the bill. Gibson's Suits in Chancery, sec. 143, sub-sec. 3; 9 Ency. of Plead. & Prac., 684; 27 C. J., 28. The lack of such allegations may be taken advantage of by demurrer, but if an issue of fraud is made without objection to the pleading, or to the evidence of fraud, it is waived, and it cannot be urged for the first time on appeal that there is no issue of fraud. See 9 Ency. of Plead. & Prac., 697-8. In this case no objection was raised to the pleadings by demurrer and there were no objections to the introduction of evidence as to fraud and misrepresentation, hence the objection is waived.

The proof shows that the complainant could neither read nor write and was not acquainted with legal procedure, and it appears that King had had trouble with injunction suits at other places and drew on his imagination in this case, but he was not warranted in making the statements to her about the injunction suit. Misrepresentations of material facts, although innocently made, if acted on by the party to his detriment will constitute a sufficient ground for rescission and cancellation in equity. 9 C. J., 1169, sec. 23; Bankhead v. Alloway, 6 Coldw., 56.

It is insisted that the statement made by King about the injunction was merely an expression of an opinion as to what might happen in the future and was not a statement of fact that induced the sale. This was a question for the jury and the jury has returned a verdict against the defendant on this proposition. Where a statement is of such a nature as that it may be interpreted either as an expression of an opinion, or as a statement of fact, whether it amounts to fraud or not is a question of fact for the jury. 27 C. J., 74, sec. 210.

Mere inadequacy of consideration alone, is not a ground for rescission.

"Whenever it appears that the parties have knowingly and deliberately fixed upon any price, however great or however small, there is no occasion nor reason for interference by courts; for owners have a right to sell property for what they please, and buyers have a right to pay what they please." Stamper v. Venable, 117 Tenn., 568, 97 S. W., 812; Pomeroy's Equity Jurisprudence, sec. 927, note 3.

But on the other hand, if it is shown that some undue advantage has been obtained by means of misrepresentation, or fraud, whereby one has purchased property at a grossly inadequate price, then the conveyance may be set aside.

"It is not sufficient to suggest weakness and indiscretion in one of the parties; for supposing it to be an unconscionable bargain, if a person will enter into it with his eyes open, equity will not relieve him, unless he can show fraud in the party contracting with him, or some undue means made use of to draw him into such agreement, but if the vendor be of feeble intellect and is without protection in the transaction, the sale at an inadequate price could not stand. To set aside a conveyance, there must be an inequality so strong, gross, and manifest, that it must be impossible to state it to a man of common sense, without producing an exclamation at the inequality of it. The court proceeds on fraud; but the basis must be gross inequality in the contract." 1 Sugden on Vendors 8th Am. Ed., p. 275-6; Mann v. Russey, 101 Tenn., 596, 49 S. W., 835; Stevens v. Ozburn, 1 Tenn. Chy. App., 213; Wright v. Wilson, 2 Yerger, 294.

As will be seen by examination of the above authorities the inadequacy of consideration must be so gross as to shock the conscience of the court before the court will set aside the conveyance, but if the consideration is greatly inadequate and the purchaser has been guilty of fraud and misrepresentation the court will set aside the conveyance. As will be seen, the Supreme Court reviewed the cases in its opinion in the case of Wright v. Wilson, supra, and the courts in some of the cases held that fraud would be presumed where the property was worth more than double the value of the money paid by the vendee, and in others where the property was worth three, four, five and twelve times the amount of money paid. In this case the jury found that the property was sold for a grossly inadequate price.

Seven witnesses for complainant testified that the property was worth from $8000 to $12,000. Five witnesses for defendant testified that it was worth about $5000. One witness fixed the value at $5000 to $7000.

M. P. King admitted that he had received in commissions about $1000, in a letter written to Mrs. Mackie. He stated on the witness stand, in reply to a question: "Yes, sir, and my commission on it was over $1000, and I haven't collected it all." Fuqua told Mrs. Mackie he was out $1000 on commission.

King testified that he and Fuqua, in determining his commission, valued the improved property at $4200. His commission at ten per cent on this was $420. They valued the unimproved property at $3875. His commission at fifteen per cent on that was $581.25. This made the value of the property $8075, valuation put on it by King and Fuqua.

King and Fuqua deny that King was Fuqua's agent, but we think the circumstances warranted the jury in finding that he was. Fuqua was discredited, and King's actions warranted the jury in finding that he was Fuqua's agent. 1 Mechem on Agency (2 Ed.), sec. 247, note 86.

We are of the opinion that the proof conforms to the pleading and that the last two issues of fact submitted to the jury were responsive to the pleadings and material, and the jury's verdict on these issues should not have been disregarded by the Chancellor, as the verdict on the first issue was not determinative; hence the first two assignments must be sustained.

The third assignment, that the court erred in sustaining the motion for peremptory instructions as to last two issues, on motion for a new trial, after the jury had been discharged, is not well made for the reason stated. If on motion for a new trial the trial court concluded he erred in not directing a verdict, it is his duty to correct the verdict rendered and he may set aside the verdict and direct a verdict, if the evidence justifies it, after the jury has been discharged. Fitch v. American Trust Co., 4 Tenn. App., 87. But we hold that the court erred in directing a verdict as to these two issues, because the issues were material and there was material evidence to support a verdict.

The assignments of errors having been sustained, it results that judgment must be set aside and the cause remanded for a new trial. In chancery cases where a jury has been demanded, the finding of the jury is final and conclusive upon the Chancellor so far as the facts involved in a material issue are concerned, provided of course the Chancellor has power to grant a new trial as in law cases, but he cannot ignore the verdict of a jury on material issues, if there is material evidence to support it, and render a decree contrary to the verdict. Gibson's Suits in Chancery, sec. 552; Gass v. Mason, 4 Sneed, 509.

The cause will be remanded to the Chancery Court of Putnam County for a new trial on the issues. The cost of the appeal is ad-

judged against L. A. Fuqua, for which execution may issue; but the cost of the cause that accrued in the lower court will await the final determination of the case.

## OPINION ON PETITION FOR A REHEARING.

This cause is again before us on petition for a rehearing, complainant insisting that the cause should not have been remanded for a new trial but instead a final decree should have been entered in this court. This insistence cannot be sustained for the reason that when a jury has been demanded in the Chancery Court "the trial shall be conducted like other jury trials at law, the finding of the jury having the same force and effect, and the court having the same power and control over the finding, as on such trials at law." Shannon's Code, sec. 6286. The cause is then tried by a jury according to the forms of a court of law. Shannon's Code, sec. 4888.

The verdict of a jury is not final until it is approved by the trial judge. He has a right to set aside the verdict and grant a new trial. He is the thirteenth juror. As stated by us in the former opinion, he had no right to disregard the verdict of the jury on material issues where there was material evidence to support it and to render a judgment contrary to the verdict. His only recourse, if he did not approve the verdict, was to set it aside and grant a new trial. Gibson's Suits in Chancery, sec. 552; Gass v. Mason, 4 Sneed, 509.

We have no power to enter a judgment on the verdict of the jury without the assent of the trial judge. There is a line of cases where the trial judge approved the verdict of the jury but did not render the proper judgment, upon appeal this court will enter such judgment as the trial court should have rendered. Nighbert v. Hornsby, 100 Tenn., 82, 42 S. W., 1060; Sword v. State, 5 Humph., 102. But these cases have no application to the one at bar where the trial judge has not approved the verdict of the jury.

It results that the petition to rehear must be denied.

Faw, P. J., and DeWitt, J., concur.