**LAND DEVELOPERS, INC., et al.,
Petitioners-Respondents,**

v.

**Kennedy R. MAXWELL et al.,
Respondents-Petitioners.**

Supreme Court of Tennessee.

April 5, 1976.

William B. Felknor, Frank B. Bird, Robert N. Navratil, Roy D. Crawford, Maryville, for petitioners-respondents.

Frederick D. McDonald, Knoxville, for respondents-petitioners.

## OPINION

HARBISON, Justice.

This case involves the question of whether certain restrictive covenants on property in a residential area should, in equity, be enforced against other property in the area not so restricted of record, by imposition of an equitable servitude or negative reciprocal easement.

The case has been tried twice in the Chancery Court of Blount County. The opinion of the Court of Appeals on the first appeal of the action is reported as *Maxwell v. Land Developers, Inc.*, 485 S.W.2d 869 (Tenn.App.1972). On the first appeal, the Court of Appeals held that the trial court had erred in not permitting certain amendments to the pleadings, and remanded the case for a new trial. With the case in that posture, this Court denied certiorari on August 21, 1972. In its first opinion the Court of Appeals construed the restrictive covenants in question, and ruled that certain evidence which had been excluded on the first trial could be considered on the second trial. It went further, however, and purported to make findings of fact and conclusions of law on the evidence which had been thus excluded, or at least its opinion could reasonably be so construed, and on the second trial the chancellor felt bound by the statements contained in the first opinion of the Court of Appeals.

On the second trial in August 1973, the chancellor entered a decree to the effect that all of the properties of the defendant parties were subject, by implication, to recorded restrictive covenants covering the property of the complaining parties and other adjacent residential tracts in the immediate vicinity. The Court of Appeals affirmed this decree as to all of the property involved, except one tract of approximately 4.8430 acres, now in the hands of persons deemed by the Court of Appeals to be bona fide purchasers or encumbrancers

for value without notice of the restrictions. The original complainants and the original defendants all filed petitions for certiorari to this Court, which were granted.

### A. *The Factual Background*

Despite a voluminous record, there is very little dispute as to the controlling facts. All of the property involved lies in the Eleventh Civil District of Blount County, Tennessee. It is in an unincorporated and unzoned area of the county, lying on both sides of the Knoxville-Maryville Highway. This is now a major four-lane divided thoroughfare, running generally north and south. The property in question lies a short distance to the north, or towards Knoxville, of a major airport facility serving the City of Knoxville and its environs. The property is now subject to a comprehensive land use plan adopted in 1972 by the Alcoa Regional Planning Commission, and lies within the jurisdiction of that commission, although it is not within the corporate limits of the City of Alcoa. The property owned by the defending parties below is shown on this land use map as agricultural and undeveloped land. The property owned by the complaining parties and others whose land is similarly restricted by recorded instruments is shown as single family residential property. The projected future land use for the area shows the property of the defending parties as being best suited for highway commercial property or agricultural, undeveloped or buffer land.

It is stipulated in the record that there is no recorded plat of a subdivision of any of the properties in question. There is no recorded restriction of any sort in the chain of title of any of the properties now owned by any of the defendants. All of the property in question, however, by stipulation, is shown to lie in a general area known as "Mimosa Heights".

It is established in the record that M. L. Tipton, predecessor in title to all of the parties defendant below, was the executor of the estate of W. D. Townsend. The relationship between Mr. Tipton and the

deceased is not shown in the record, nor is the will of Mr. Townsend in the record. In his capacity as executor, however, Mr. Tipton conveyed a number of acreage tracts in the same general area between the years 1939 and 1951, restricting each tract thus conveyed by covenants and restrictions in the deeds, of a generally similar nature. These restrictions were not identical in their terms, but basically they restricted the land conveyed to use for residential purposes only, prescribing the minimum cost of improvements, setback lines, etc. Generally the deeds prescribed that there should be no more than one residence erected upon the tract covered by a particular deed, and most of the earlier deeds contained racial covenants, no longer operative for constitutional reasons.

Mr. Tipton conveyed twelve parcels in his capacity as executor of the estate of W. B. Townsend. Thereafter, although his deeds are not in the record, Mr. Tipton acquired the remaining acreage personally, and he and his wife executed four deeds to various purchasers containing generally the same restrictions, although one of these deeds was to a tract of twenty acres and specifically permitted the erection of two residences thereon. In 1952 Mr. Tipton caused to be formed a corporation known as Tipton Investments, Inc., which is one of the defendants to the action. On November 3, 1952, Mr. Tipton and his wife conveyed all of the remaining unsold acreage in the area to this corporation, without restrictions of any sort. It is stated by counsel that the deed or deeds by which Mr. Tipton had acquired title personally were also unrestricted, although, as stated, these instruments have not been filed.

No corporate records, stock certificates or minute books of Tipton Investments, Inc., have been filed in this case at any time. The exact ownership of the stock in the corporation is not reflected in the record, although generally it is stated that Mr. M. L. Tipton "controlled" the corporation, and, by inference at least, it is indicated that either he or his wife owned all of the stock in the company.

The description in the deed to Tipton Investments, Inc., in 1952 contains eighteen exceptions, each of these referring to a prior deed and the recording data as to each.

In the ten years between November 1952 and November 1962, Tipton Investments, Inc., by Mr. M. L. Tipton as President, conveyed eleven parcels in Mimosa Heights, each deed containing restrictions similar to those described above.

There is no evidence in the record as to who prepared the various deeds for and on behalf of Mr. Tipton. He is shown in the record as having been a wealthy and able businessman, a person of high honor and integrity, and an experienced real estate developer. He owned and conveyed in various ways several hundred acres of land in the same general part of Blount County, but lying outside of the immediate area involved in this case.

The restrictions in the various deeds given by Mr. Tipton as executor, individually, and as a corporate officer, seem to be carefully worded. In the earlier deeds there was no reference to Mimosa Heights, especially in deeds to parcels fronting on the highway above referred to, called the Alcoa Highway in the record.

The property in each of the deeds is described by metes and bounds, reference being made to iron pins and surveyor's calls. There is no reference to any specific subdivision, nor to any lot number. The deeds simply describe acreage tracts, ranging from two acres to twenty acres, so that relatively large parcels of land were involved, rather than small, uniform city or suburban subdivision lots. Indeed, at least three witnesses testified that Mr. Tipton at no time referred to the parcels being conveyed as "lots" but always referred to them as "tracts", since they involved a number of acres, ranging from two acres upwards. There is no showing in the record that any of the tracts had been staked out prior to sale, and we can only assume from such information as is contained in the record that each tract was surveyed as sold. A number of the purchasers testified that they obtained title opinions or title insurance on their tracts, but no title documents, other than the deeds themselves, have been filed in the record in this cause.

The preamble and the concluding portions of the restrictions as contained in most of these deeds are quoted in the first opinion of the Court of Appeals, but for convenience will be repeated here. They provide:

"However, this conveyance is made and accepted upon each and all of the stipulations, restrictions and conditions hereinafter set forth, which are hereby made covenants running with the land and which shall apply to and be binding upon the purchasers, their heirs, representatives, successors and assigns, as well as between the owners of tracts or parcels of land in Mimosa Heights, acquired under similar restrictions, to the end that the general uniform plan for a highclass residential suburb may be adhered to and be enforced by the owners of said tract."

Following this sentence were the specific restrictive covenants, and then the following language:

"These covenants and restrictions are to run with the land and shall be binding on the grantee and all persons claiming under them until January 1, 1990, at which time said covenants shall terminate. If the grantee hereto, or his heirs, executors, administrators or assigns, shall violate or attempt to violate any of the covenants or restrictions herein, it shall be lawful for any other person or persons owning lots in said development, which were acquired under similar restrictions, to prosecute any proceedings at law, or in equity, against the person or persons violating or attempting to violate any such covenant or restriction, either to prevent him or them from doing so, or to recover damages or other dues for such violations. Any invalidation of any one of these covenants by judgment or Court order shall in no wise affect any of the other provisions, which shall remain in full force and effect."

It should be noted that there is no specific covenant in any of the deeds binding the grantor, or his successors, to restrict the remaining unsold land in the hands of the grantor in a similar manner. Neither is there any covenant or provision that the grantor would not do so. A simple provision on this subject, one way or the other, might have eliminated the present controversy.

Mr. M. L. Tipton himself owned a tract of several acres on the easterly side of the highway, where he resided. It is undisputed in the record that he provided a water system for all of the tracts in question, although no contracts or documents are filed reflecting his arrangement with the various purchasers concerning the furnishing of water. The water tower for the system stood on an elevation to the west of the property in question, as we understand the record, but could be seen from the highway. Some of the witnesses testified that Mr. Tipton furnished water to them at a stipulated rate per annum. At some date, not clearly shown in the record, the City of Alcoa commenced furnishing water to residents in the area, and the private water system was discontinued.

Mr. Tipton is shown to have established signs along the highway at each end of the area, bearing the legend "Mimosa Heights". He is also shown to have planted mimosa trees along the original highway, which was a two-lane thoroughfare, although both the original signs and the mimosa trees were destroyed when the highway was later widened to four lanes. The Highway Department, however, erected its own signs, with the legend "Mimosa Heights", generally in the same area where the original signs had been placed.

Mr. Tipton also had drawings or plats of the area prepared, none of them in recordable form, showing a general plan of residential lots for the entire area. Copies of two of these drawings were shown to or given to a number of the purchasers.

Mr. and Mrs. Tipton had but one child, a son, who died without issue in an automobile accident prior to the death of his parents. Both Mr. and Mrs. Tipton died in an airplane crash in November 1962, so that by a sudden and bizarre series of events, all of the directors, officers and stockholders in the closely held corporation known as Tipton Investments, Inc., were killed.

The record does not show whether M. L. Tipton died testate or intestate. There is some general reference in the record to his "executors". The brother of Mr. Tipton, M. A. Tipton, purchased the Tipton residence on the east side of the highway, from the estate. He and his sisters also "inherited" the stock of Tipton Investments, Inc. Mr. M. A. Tipton testified that he had received eighteen percent of the stock of this corporation, and he stated the percentage of ownership of several of his sisters. Again, no corporate records or ledgers are filed in the record, and we are left to assume that M. A. Tipton and his sisters were either beneficiaries under the will of M. L. Tipton, deceased, or that they were his distributees and next of kin. It is not shown in the record that they purchased the stock from the executors or administrators, so that we are forced to the conclusion that they are not bona fide purchasers for value thereof.

The record is undisputed that neither Mr. M. A. Tipton, his sisters, nor any other subsequent officer or stockholder of Tipton Investments, Inc. had any connection or relationship with the corporation or with the land in question prior to the death of M. L. Tipton and his wife in November 1962. Mr. M. A. Tipton testified that he was in South America when his brother died, although how long he had been there does not appear from the record. He did testify that once, several years before his brother's death, he had made inquiry from his brother about building a residence for a client in the disputed area, but he testified that this proposed construction was rendered impossible because the land lay in the flight pattern of the municipal airport serving Knoxville, and was no longer eligible for FHA financing.

There is a great deal of other testimony in the record to the effect that the condi-

tion of the area has changed from that of a semi-rural community when Mr. M. L. Tipton first began making conveyances in 1939 and the early 1940s. Not only has the highway become heavily traveled, and the airport facilities greatly enlarged, but extensive commercial development has occurred along the highway to the south of the subject property, and there has been some commercial development, although not to as great an extent, to the north.

All of the property in question owned by the defending parties is on the westerly side of the Knoxville-Maryville Highway. It consists of some sixty-three acres on which there has been no building or construction, except for some grading which commenced in September or October, 1969 and continued into 1970. Residents of the area noticed this grading, and the placing of a sign on part of the property, offering it for sale for commercial development. These events precipitated the initiation of this suit on March 12, 1970.

All but two of the complaining parties own property lying on an elevation above the property of the defendants, and fronting on the westerly side of a public road known as Vista Road. Two of the complainants own acreage tracts on the east side of the Maryville Highway, one of them fronting on the highway, and both of them adjoining a public road known as Crescent Road. There is no testimony in the record that Mr. M. L. Tipton developed either of these two roads, or as to exactly when they were opened. Vista Road is referred to in deeds going back as far as 1942, and one witness testified that it was a paved road in 1952 when he was shown the property which he purchased.

In 1963, during the year following the death of his brother, Mr. M. A. Tipton and others formed a corporation known as Land Developers, Inc., which is also a party defendant to the present case. M. A. Tipton owns one-third of the stock in this company, his son one-third, and his business partner in another venture, O. H. Reynolds, owns the remainder. This company has engaged over the years in the purchase and development of a number of parcels of real estate, including a large acreage tract purchased from Tipton Investments outside of the area known as Mimosa Heights.[1]

In 1966, M. A. Tipton, as President of Tipton Investments, Inc., conveyed two parcels on the easterly side of the highway to two of his sisters. Each of these deeds contained restrictions similar to those which had been inserted in prior conveyances by M. L. Tipton.

In 1968 Tipton Investments, Inc. conveyed two parcels of the land now in question to Land Developers, Inc., one containing 38.776 acres, and the other, six acres. The latter tract fronts on the westerly side of the highway; the larger tract lies to the west and to the rear of that tract and of other property owned by Tipton Investments, Inc. Tipton Investments, Inc. remained the owner of approximately nineteen acres fronting on the westerly side of the highway until 1972, when it conveyed 4.8430 acres to an unaffiliated and unrelated corporation, Inland, Inc. Tipton Investments, Inc. continues to own the remainder, consisting of about fifteen acres, more or less, fronting on the westerly side of the highway, and lying between the land conveyed to Inland, Inc. on the south and the land conveyed to Land Developers, Inc. on the north and west. The deeds to Land Developers, Inc. and to Inland, Inc. were regular warranty deeds, containing no restrictions.

The conveyance to Inland, Inc. of the 4.8430 acres above referred to was the result of a contract entered into between that company, and the other two corporate defendants, Tipton Investments, Inc. and Land Developers, Inc. Under the terms of this contract, dated December 5, 1969, Inland, Inc. agreed to do grading and filling on the property of the other two corporations, at a stipulated price per cubic yard, plus the conveyance to it of a portion of the land owned by Tipton Investments, Inc.

1. The deed to this tract was executed in 1963.

Inland, Inc. had performed a substantial percentage of its work, estimated at from forty percent to over sixty percent, prior to the filing of the present suit in March 1970. It continued to perform the remainder after the suit was filed, and ultimately received a deed in 1972. Neither Inland, Inc. nor its successors in title, the Estate of Robert C. Jackson and others, were made parties to the action initially, and in fact were never joined as parties defendant by the original complainants. After the remand of the case for a new trial following the first appeal, the successors in title of Inland, Inc. intervened as defendants in the case in an effort to protect the title to their 4.8430 acres.

## B.  *Prior Proceedings*

In the initial action the complainants sought to impress upon the sixty-three acres, then titled in Land Developers, Inc. and Tipton Investments, Inc., the same restrictions as to residential use as had been imposed upon complainants and other grantees under deeds from M. L. Tipton in the years between 1939 and 1962. Complainants alleged that Mr. M. L. Tipton had developed and established a general plan for the development and use of the entire subdivision known as Mimosa Heights. They recited many of the facts and circumstances set out above, and alleged that because of this general plan all property in the area known as Mimosa Heights, including that remaining in the hands of Tipton Investments, Inc. and its grantees, was subject to the same general restrictions. An injunction was sought to prevent commercial development by Land Developers, Inc. of the forty-three acres which it had offered for sale and, in effect, a declaratory judgment to the effect that all of the remaining unsold property in the area would be subject to the same restrictions.

Each of the defendants pled the statute of frauds, the parol evidence rule and material change in the character of the neighborhood, and each denied that its property was or was intended to be subjected to the restrictions placed by M. L. Tipton in the deeds which he had previously executed.

The chancellor dismissed the action of the complainants in 1971, holding that the lands of the defendants were not embraced within any recorded restrictions and that there were no restrictions in the chain of title to their properties.

The Court of Appeals reversed, and held that the language used in the restrictive covenants was susceptible to two different constructions. We have previously pointed out that at no place in these covenants did the grantor ever covenant that it would subject its remaining property to these same restrictions, nor did it reserve the right not to do so. The Court of Appeals held that the language appearing in the restrictive covenants was ambiguous, and that it:

"  .   .   .   could mean, as insisted by the defendants, that the grantor thereby reserved the right to sell other lots within Mimosa Heights without any restrictions." 485 S.W.2d at 872.

The Court stated, however, that the language referring to a general uniform plan

"would indicate there was a general plan applicable to all tracts in Mimosa Heights. These words would also indicate the owners of all tracts in Mimosa Heights could enforce the general plan." *Ibid.*

The Court of Appeals remanded the case for a new trial, holding that parol evidence would be admissible in view of the ambiguity thus found. It also stated that evidence which had been offered but excluded at the first trial would tend to prove not only a general plan, but actual knowledge thereof on the part of officials of the two corporate defendants. It held that only persons having actual knowledge of such an unrecorded general plan would be bound thereby.

At the conclusion of the first trial, the complainants had offered an amendment, charging "constructive fraud". The Court of Appeals held that this amendment should have been allowed, and further stated that

representations made to the complainants by M. L. Tipton would be admissible in support of this claim.

When the case was remanded, therefore, the complainants did amend their complaint, and the entire second trial was conducted upon the premise that any attempt by the defendants to use their property contrary to the general restrictions would amount to a "constructive fraud" upon the complainants and should be enjoined.

The second trial was before a different chancellor. The oral representations of M. L. Tipton and other items of evidence excluded at the first trial were admitted, together with some additional proof. At the conclusion of the trial the chancellor stated that he felt that the result which he reached was harsh and inequitable. He concluded, however, that several issues had already been decided in the first opinion of the Court of Appeals and that he was bound thereby. He accordingly found the defendants guilty of constructive fraud, imposed the restrictions upon their acreage, and enjoined defendants from using it contrary to the general restrictions previously referred to. In addition, he composed some explicit and different restrictions as to lot sizes, which were not found in any of the previous deeds.

In his decree, the chancellor did not find that M. A. Tipton or any of the successors in interest of M. L. Tipton had actual knowledge of Mr. Tipton's general plan of development. He simply cited the prior opinion of the Court of Appeals in which that Court apparently held that such actual knowledge had been shown. The result of this most unusual handling of the case is that neither chancellor made an independent finding on the crucial issue of whether M. A. Tipton or any of his associates did or did not have actual knowledge of the representations and general plan of development by M. L. Tipton.

On appeal from the second trial, the Court of Appeals affirmed the judgment of the chancellor, including conclusions that M. L. Tipton and his successors in interest had

committed "fraud" against the complaining parties. It did hold, however, that the intervening defendants, claiming through Inland, Inc., were bona fide purchasers or encumbrancers for value without notice of any implied restrictions, and that even though they ultimately took their deed after the present suit had been filed, they were entitled to hold their property free and clear of the restrictions.

## C. *Reciprocal Negative Easements*

■ Ordinarily when the owner of a tract of land subdivides it and sells different lots to separate grantees, and puts in each deed restrictions upon the use of the property conveyed, in accordance with a general building, improvement or development plan, such restrictions may be enforced by any grantee against any other grantee. Likewise, the property remaining in the hands of the vendor may also be held in equity to be subject to a servitude so as not to be used in a manner different from that contained in the restrictions.

This rule was recognized in this state in the leading case of *Ridley v. Haiman,* 164 Tenn. 239, 47 S.W.2d 750 (1932). As stated in that case:

"Some of the cases refer to the rights which the several purchasers acquire under these restrictive covenants in the several deeds as mutual or reciprocal negative easements." 164 Tenn. at 252, 47 S.W.2d at 754.

One of the leading cases on the subject, and one relied upon by this Court in the *Ridley* case, *supra,* is *Sanborn v. McLean,* 233 Mich. 227, 206 N.W. 496, 60 A.L.R. 1212 (1925). See also 20 Am.Jur.2d *Covenants, Conditions and Restrictions,* §§ 173 *et seq.*

There can be no question from an examination of the restrictive covenants in the various deeds executed by M. L. Tipton, that the grantor therein did indeed intend for there to be a permanent plan or scheme for the development of Mimosa Heights, and by the express wording of the deeds, each grantee was given a right to enforce

the restrictions against any other grantee holding property "acquired under similar restrictions."

The question presented, therefore, is whether or not like or reciprocal easements or restrictions upon use may be imposed, in equity, upon the property remaining in the hands of the grantor, and those who stand as successors or assigns of the grantor.

■ There is a concurrent finding of fact by the chancellor and the Court of Appeals that M. L. Tipton and the corporation which he formed, Tipton Investments, Inc., did have a general plan or scheme for the development of this area, even though there was no recorded subdivision plat and no general restrictions recorded covering the entire area. Abundant material evidence supports this concurrent finding, from the language of the deeds themselves and from uncontradicted testimony concerning the conduct of Mr. Tipton, wholly apart from any question of the admissibility of oral representations made by him. The many deeds signed by him refer to "the general uniform plan for a highclass residential suburb".

Indeed, it appears from the language of the deeds that Mr. Tipton was familiar with the doctrine of equitable servitudes or restrictions. In some of the later deeds which he executed, after racial covenants and restrictions were no longer constitutionally enforceable, he changed the numbering of the specific conditions, and added an eighth restriction as follows:

"8. This conveyance is made subject to all other equitable restrictions which have been imposed upon the within premises by reason of such restrictions having been placed upon adjoining lands in previous conveyances by the grantor to adjoining owners."

The doctrine of equitable servitudes, including negative reciprocal easements, is not an unfamiliar one in American property law. See *Restatement, Property*, §§ 452, 476 (1944); 7 Thompson, *Real Property* §§ 3163 et seq. (1962).

■ Of course, it is well settled, in Tennessee as elsewhere, that an owner of land is not bound by covenants restricting the use of the land by his remote grantor, when such covenants do not appear in the owner's chain of title and when he had no actual notice of the alleged covenant at the time he acquired title. See *Yates v. Chandler*, 162 Tenn. 388, 38 S.W.2d 70 (1931). In such cases, the covenant of the remote grantor may be construed as a personal one only. Further, the doctrine of negative reciprocal easements, while well recognized in the law of property, is to be applied with great care. Thus the Court of Appeals of Kentucky, while recognizing the doctrine, stated:

"We think it quite apparent that the doctrine ought to be used and applied with extreme caution, for it involves difficulty and lodges discretionary power in a court of equity, in a degree, to deprive a man of his property by imposing a servitude through implication." *McCurdy v. Standard Realty Corp.*, 295 Ky. 587, 175 S.W.2d 28, 30 (1943).

■ Upon the facts shown in this record, we have no hesitancy in holding that the unsold lands of Mr. M. L. Tipton, and his corporation, here in issue, were restricted in his hands by essentially the same covenants as he had imposed in the deeds to his various grantees, by an equitable servitude, because there seems to be little question but that he did intend a general plan for the development of the entire area as a residential "suburb" or subdivision.

■ We have accordingly concluded that the acreage remaining in the hands of Tipton Investments, Inc. on the west side of the Knoxville-Maryville Highway is, by negative reciprocal easement, subject to the same general conditions, restrictions and covenants as were imposed by M. L. Tipton individually and as president of Tipton Investments, Inc. We cannot approve, however, the special restrictions and conditions concerning lot sizes composed by the chancellor without any evidentiary basis in the record. The knowledge which Mr. Tipton

had of his plan to restrict the entire area is certainly imputable to the corporation of which he was president and apparently either the sole stockholder or, together with his wife, controlling stockholder. By reason of the sudden death of Mr. and Mrs. Tipton in 1962, all persons who seemingly had any direct knowledge of this plan were suddenly removed, but the corporation continues as a separate entity, and we hold that that corporation, Tipton Investments, Inc., is charged with Mr. Tipton's knowledge under the circumstances, since there has not been a bona fide sale of its stock, for value, to independent purchasers.

### D. *Actual Knowledge of M. A. Tipton*

We have examined this record with minute care, and we are unable to find any evidence therein that M. A. Tipton had any actual knowledge or information of the representations, intentions or plans of his deceased brother, M. L. Tipton. No such evidence has been offered. Mr. M. A. Tipton, both by deposition and at trial, testified positively that he had no such knowledge. No single witness who testified in the case ever discussed the matter with him or relied upon any representation made by M. A. Tipton in any manner. He never saw any of the plats or sketches of the area prior to the filing of this suit, insofar as the record reveals. The fact that he executed two deeds to his sisters, imposing similar restrictions, to property lying on the east side of the highway, is certainly not evidence that he had knowledge of anything other than what was in the records of the Register's Office of Blount County. The records showed that Mr. M. L. Tipton, in every deed which he executed except to his own corporation, did insert covenants restricting the use of the parcels conveyed. Mr. M. A. Tipton readily admitted that he had this knowledge, and of course, under the recording statutes of this state, he was charged with having it, whether he actually had it or not.[2] This, however, is a far cry from charging him with knowledge of unrecord-

ed, oral, or implied easements or restrictions covering the large unsold acreage tract remaining in the hands of Tipton Investments, Inc. as of November 1962.

Nearly six years after the death of his brother, and about five years after the corporation known as Land Developers, Inc. had been formed, M. A. Tipton, as president of Tipton Investments, Inc., did convey to Land Developers, Inc. two tracts consisting of approximately forty-five acres, as above described. These sales, made in 1968, were made for full market value, insofar as the record shows, and there is no testimony that they were not bona fide sales at arms' length.

We recognize, as the Court of Appeals pointed out in its first opinion, that intercorporate transactions, among entities having common stockholders or directors, could be the subject of fraud, and that it would be possible "to set the stage for considerable chicanery by the mere dropping of a corporate veil so as to .isolate the corporate entity from the knowledge possessed by its corporate grantor (Tipton Investments, Inc.). . . ." 485 S.W.2d at 874.

In that opinion, however, the Court of Appeals was dealing with the case in a posture where amendments to the pleadings were being considered. Of course, when a court is dealing with pleadings it is necessary to consider all theoretical possibilities. The burden of proof rested upon the complainants in this case, however, to establish by credible and competent evidence that actual knowledge on the part of M. A. Tipton did exist, and that his relationship to Land Developers, Inc. was such that that corporation also would be charged with actual knowledge; or, in the alternative, the complainants had to prove that the transfer from Tipton Investments, Inc. to Land Developers, Inc. was a fraud and a sham. Complainants have failed to offer any competent or credible evidence to establish either of these propositions. We have already stated that the record is devoid of any evidence of actual knowledge on the

2. T.C.A. § 64–2602.

part of M. A. Tipton, and there certainly is no evidence that the transfer of title to Land Developers, Inc., five years after it had been formed, was made as a subterfuge or to drop a corporate veil so as to isolate it from the imputed knowledge attributed, by fiction of law, to Tipton Investments, Inc.

We have accordingly concluded that all properties conveyed by Tipton Investments, Inc. to Land Developers, Inc. should, in equity and under the proof shown in this record, stand free and clear of the restrictions in question, as being in the hands of a bona fide purchaser for value without notice. See *Lenzi v. Colberg,* 13 Tenn.App. 535, 542 (1931).

### E. *The Land Conveyed to Inland, Inc.*

By written contract dated December 5, 1969, Tipton Investments, Inc. and Land Developers, Inc. entered into a written agreement with a wholly independent corporation engaged in the earth moving business, called Inland, Inc. This contract called for grading and earth fill work on the land owned by Tipton Investments, Inc., but grading and removal of earth were also to occur on the acreage owned by Land Developers, Inc.

Under this contract some 500,000 cubic yards of earth were moved, and Inland, Inc. was paid a stipulated price per ton. In addition, in accordance with the terms of the contract, it was conveyed 4.8430 acres of the southerly portion of the land still remaining in the hands of Tipton Investments, Inc., and fronting on the westerly side of the highway. The deed from Tipton Investments, Inc. to Inland, Inc. is dated January 13, 1972 and was recorded on March 9, 1972. A substantial portion of the contracted work had been performed before the present suit was ever filed, however, on March 12, 1970, and the remainder was performed thereafter. It is uncontradicted in the record that no officer, official or stockholder of Inland, Inc. had any knowledge of any oral representation made to the complainants by M. L. Tipton, or any knowledge of any general plan of development by Mr. Tipton which might result in the imposition of the land use restrictions upon the lands remaining in the hands of Tipton Investments, Inc. Officials of Inland, Inc. did learn of the filing of the suit shortly after this occurred in March 1970, but by that time the contract work was far advanced. Inland, Inc. was a subsidiary of Harrison Construction Company, and through a series of corporate mergers and conveyances of the 4.8430 acres, title to this tract ultimately became vested in the intervening defendants by deed dated February 14, 1973. None of the deeds to Inland, Inc. and its successors in title contained any restrictive covenants.

The intervenors insist that they are bona fide purchasers or encumbrancers, so that their land is free of restrictions. Complainants assert, however, that the common law doctrine of *lis pendens* applies, because the suit of the complainants had been filed before the deed to intervenors was executed and recorded.

The complainants, of course, are seeking to assert an equitable servitude against the property of the intervenors. The intervenors are asserting a prior equitable claim against the same land. Neither the intervenors nor the complainants utilized the recording statutes, which play a major role in determining priorities between conflicting claims.

One holding a valid contract for the purchase of realty, of course, has an equitable interest therein.[3] Such a contract is recordable,[4] but is valid between the parties without recordation.[5] The equitable claim of the intervenors arose upon the execution of their contract, which was prior to the filing of this suit.

Prior to the enactment of T.C.A. § 20–301, Tennessee recognized the equitable

---

3. *Greenwood v. Maxey,* 190 Tenn. 599, 610, 231 S.W.2d 315 (1950); *Bates v. Dennis,* 30 Tenn. App. 94, 203 S.W.2d 928 (1946).

4. T.C.A. § 64–2401.

5. T.C.A. § 64–2601.

rule of a lien *lis pendens,* arising upon the filing of a suit in a court of record. See 1 Gibson, *Suits in Chancery,* § 75 (Crownover 1956). Such a lien ordinarily commenced from the date of the filing of the suit asserting a claim against a specific tract of land. This filing was deemed notice to all persons thereafter acquiring rights in or a claim against the land. See *Roberts v. Frogge,* 149 Tenn. 181, 258 S.W. 782 (1923).

Although the common law doctrine of liens *lis pendens* upon the filing of a suit has not been totally superseded by statute, there is no question but that the enactment of T.C.A. § 20–301 sharply modified it, especially as to certain types of claimants. The statute is as follows:

> "20–301. *Filing of Abstract*—When any person, in any court of record, by declaration, petition, bill or cross bill, shall seek to fix a lien lis pendens on real estate, or any interest therein, situated in the county of suit, in furtherance of the setting aside of a fraudulent conveyance, of subjection of property under return of nulla bona, tracing a trust fund, enforcing an equitable vendor's lien, or otherwise, he shall file for record in the register's office of the county an abstract, certified by the clerk, containing the names of the parties to such suit, a description of the real estate affected, its ownership, and a brief statement of the nature and amount of the lien sought to be fixed. Until same is so filed, so far as concerns the rights of bona fide purchasers and encumbrancers, for value, of the realty, or any interest therein, they shall not be affected."

No such abstract was ever filed by the complainants in this case, nor did the complainants ever join the intervenors as parties defendant to the suit. The intervenors were granted permission to become parties defendant, in 1973, after their deed had already been recorded and prior to the second trial of the action.

Under these circumstances, the Court of Appeals held that complainants were required to file an abstract of their suit in the Register's Office for Blount County, Tennessee in order to achieve priority over the deed to the intervenors. It held that since Inland, Inc. had entered upon the performance of its contract in good faith and without notice prior to the filing of this suit, it was a bona fide encumbrancer within the meaning of T.C.A. § 20–301. Although its officials had actual notice of the suit following the filing of the same, and this might have prevented Inland, Inc. from becoming a bona fide "purchaser", nevertheless its equitable claim against the land was deemed to be an "encumbrance" so as to entitle Inland, Inc. to the protection of T.C.A. § 20–301.

Complainants insist that the Code section only pertains to the enforcement of monetary lien claims against real estate, and that a suit to enforce an equitable servitude is not embraced within its terms. Complainants, however, are claiming a "lien lis pendens" in order to establish their priority over the intervenors. While most of the proceedings referred to in the statute are in the nature of creditors' suits, the statute speaks in broad language and seems to include all types of liens *lis pendens* by the use of the words "or otherwise", especially insofar as the rights of bona fide purchasers or encumbrancers are concerned.

Prior to 1967, T.C.A. § 20–301 was limited in its application by T.C.A. § 20–302, which read as follows:

> "Section 20–301 applies to liens lis pendens proper, and is not to be construed to apply to liens or the enforcement of liens of instruments, judgments, decrees or levies, of record, in the county, or to attachment suits brought in the county where the property is situated, to enforce a debt, demand, or lien of any character."

The latter section, however, was expressly repealed by Section 4, Chapter 375 of the Public Acts of 1967. This Act also modified sharply T.C.A. § 25–501, which formerly provided that judgments or decrees in courts of record were, from the date of rendition, automatically made liens upon lands of the debtor lying in the county

where the judgment was rendered. Since 1967, however such judgments become liens only upon the filing of a certified copy of the judgment or decree in the lien book of the Register's Office of the county where the land is located. T.C.A. § 25–501 (1975 Supp.).

Of course, there are some specific statutes which provide for liens *lis pendens* upon the filing of a suit against certain classes of persons. See T.C.A. § 26–604. The present suit was not brought under such a statute, however.

The 1967 Act above referred to sharply limited the effect upon title to real property of the mere filing of a suit or even the obtaining of a judgment, and reflected a strong legislative policy to require recordation in the Register's Office of an abstract by persons seeking priority over bona fide purchasers or encumbrancers.

█ There is, of course, also a strong policy in favor of the recordation of any document involving rights in land, insofar as third persons are concerned. See *Wilkins v. McCorkle,* 112 Tenn. 688, 80 S.W. 834 (1904). But there can be no question that common law *lis pendens* has been greatly modified by T.C.A. § 20–301 as to bona fide purchasers or encumbrancers for value. See *Cannon Mills v. Spivey,* 208 Tenn. 419, 346 S.W.2d 266 (1961).

█ We agree with the analysis of the Court of Appeals that under the facts shown here, Inland, Inc. was a bona fide encumbrancer for value of the property without notice of the rights of complainants at the time the suit was filed, seeking to enforce their equitable claim against the land. We need not decide whether complainants would have prevailed over Inland, Inc. had they filed an abstract pursuant to the statute, since this did not occur.

As to the contention of the complainants that they likewise are entitled to claim the benefit of the recording statutes and may rely upon the failure of Inland, Inc. to record its contract of purchase, we agree with the following comments by the Court of Appeals:

"The complainants are not prejudiced by the failure of Inland, Inc. to record its contract. If the contract had been recorded very likely Inland, Inc. would have been made an original party defendant. If so, the rights of Inland, Inc. under its contract, without knowledge of the issues which prompted this litigation, would have prevailed upon its completion of the contract. The complainants have no cause to interfere with that contract, and Inland, Inc., under the facts, had every right to proceed with its performance, complete the contract and accept the deed to 4.8430 acres as payment therefor."

F. *Other Contentions of the Parties*

█ We have noted previously that the defendants below insisted that there has been such a material change in the character of the vicinity and such growth of commercial development in and around it as to justify the Court, acting on equitable principles, to terminate all residential restrictions on the subject property. The courts in this state have such power, and in appropriate cases have exercised it. While there is substantial evidence of commercial development in the area surrounding the property, nevertheless there is a finding of fact by the chancellor, concurred in by the Court of Appeals, to the effect that such changes as have occurred are not sufficiently significant or radical to justify equitable relief upon this basis. The legal theory governing such relief and the type of proof required to justify it are discussed fully in the case of *Hackett v. Steele,* 201 Tenn. 120, 297 S.W.2d 63 (1956). We are of the opinion that there is material evidence in the record supporting the findings of the courts below, and their denial of relief to defendants upon this equitable principle is affirmed.

The courts below, in part at least, rested their decision to impose the restrictive covenants upon the property of the defendants

upon the principle of constructive fraud. There is no claim of actual fraud, deceit or misrepresentation on the part of anyone in this case, and there is no evidentiary basis for any such claim even had it been advanced. Both courts below, however, have concluded that any attempt by Land Developers, Inc. or Tipton Investments, Inc. to use their properties in a manner different from the covenants governing the property of the complainants would amount to constructive fraud.

We are unable to approve this conclusion. The doctrine of constructive fraud is recognized in this state as being a principle of equity. See 2 Gibson, *Suits in Chancery,* §§ 982–984 (Crownover 1956). Although it has been applied in a variety of cases, ordinarily, as between private parties, the doctrine has been employed where there has been an abuse of a fiduciary or confidential relationship between the parties. It has particularly been used for the purpose of canceling or rescinding transactions where there has been an overreaching or undue advantage taken between parties who are not dealing at arm's length. See *Mackie v. Fuqua,* 14 Tenn.App. 176 (1931); *Bank of Blount County v. Dunn,* 10 Tenn.App. 95 (1929).

Although the complainants were permitted to amend their pleadings so as to allege constructive fraud, their counsel concedes in his brief before this Court that this allegation added little to the original claims or contentions of the complainants. The properties of the defendants were restricted, wholly or in part, through the representations and conduct of M. L. Tipton, upon other principles of equity which have heretofore been discussed, or else they were not restricted at all. There has been no attack made upon the character, reputation or veracity of any of the persons, living or dead, concerned with the land transactions which are the subject matter of this case. We believe that the courts below erred in invoking or attempting to apply to the facts shown here the doctrine of constructive fraud.

The defending parties have relied upon and stressed the well-settled principle in this state that while restrictive covenants will be recognized and enforced according to their terms, they should be strictly construed and all doubts resolved in favor of the free use of property. This principle has been recognized in a number of cases, and no departure therefrom should be inferred by the decision reached in the present case. See *Shea v. Sargent,* 499 S.W.2d 871 (Tenn. 1973); *Turnley v. Garfinkel,* 211 Tenn. 125, 362 S.W.2d 921 (1962). This rule, of course, does not prevent the application of the rules regarding equitable servitudes in proper cases.

Because the restrictive covenants in the present case were ambiguous, however, and were susceptible of at least two different interpretations, it was proper to require proof of actual knowledge of the representations, conduct and intentions of M. L. Tipton on the part of his successors before the restrictions would be imposed upon land, record title to which did not show the restrictions.

The serious impact of imposing restrictive covenants lying outside the record chain of title was recognized and discussed in the case of *Yates v. Chandler,* 162 Tenn. 388, 38 S.W.2d 70 (1931), referred to earlier in this opinion. Quoting from other authorities, the Court there said:

"'A purchaser may well be held bound to examine or neglect at his peril, the record of the conveyances under which he claims, but it would impose an intolerable burden to compel him to examine all conveyances made by every one in his chain of title.'" 162 Tenn. at 392, 38 S.W.2d at 71.

Although they are discussed in the very excellent briefs filed on behalf of all of the parties in this case, we agree with the Court of Appeals that under the facts and circumstances shown in this record there is no controlling issue as to the statute of frauds, the parol evidence rule, the statute of limitations or the doctrine of laches.

## G. *Conclusion*

In accordance with the foregoing, we vacate and reverse so much of the opinions and decrees of the courts below as impose any of the claimed restrictions in this case upon the properties of Land Developers, Inc. or Inland, Inc. and its successors in title. These properties are declared to stand free and clear of the restrictive covenants governing the property of the complainants.

Those lands of Tipton Investments, Inc. which are still held by it, lying on the westerly side of the highway and consisting of approximately fifteen acres as we understand the record, are declared to be subject to the covenants and restrictions set out in the final decree of the chancellor, except those contained in paragraph 3 appearing on page 4 thereof, which purport to limit the number of residences to one per half acre. While this is probably a lenient restriction insofar as the defendant Tipton Investments, Inc. is concerned, we find no evidentiary basis for it in the record. If there is to be any platted residential subdivision of the property of Tipton Investments, Inc., it will be subject to present requirements concerning approval of a recorded plat by appropriate planning or zoning agencies and health authorities,[6] and the size of lots and density of housing would be subject to their criteria.

The judgments of the courts below are accordingly reversed in part and, as modified, affirmed in part. Costs of the cause will be taxed one-half against the complainants and one-half against Tipton Investments, Inc.

FONES, C. J., and COOPER, BROCK and HENRY, JJ., concur.

---

6.  See T.C.A. §§ 13–302 *et seq.*; T.C.A. § 53–2048 *et seq.*