IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 10, 2007 Session

**JOE GAMBRELL, ET AL. v. SONNY NIVENS, ET AL.**

**Direct Appeal from the Chancery Court for Fayette County**
**No. 12072     Dewey C. Whitenton, Chancellor**

**No. W2007-00102-COA-R3-CV - Filed February 27, 2008**

This case involves the enforcement of restrictive covenants in equity. After subdividing their property, imposing restrictions on the three lots they sold, and retaining the remaining land, vendors brought suit against remote grantees to enforce the restrictive covenants and to enjoin them from operating a wedding chapel, for commercial use, on the land. The central issue on appeal is whether the restrictions bind the remote grantees when the covenants were listed on an undated and unsigned attachment to a deed that neither identified encumbrances nor incorporated the attached restrictions. Following a trial on the matter, the trial court permanently enjoined the commercial activity because the remote grantees took title with actual notice of the restrictions. Finding ample support for the imposition of an equitable servitude, we concur in the trial court's judgment. Affirmed and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

J. Payson Matthews, Somerville, Tennessee and David M. Sullivan, Memphis, Tennessee, for the appellants, Sonny Nivens and Carrie Nivens.

John Marshall Jones, Memphis, Tennessee, for the appellees, Joe Gambrell and Jeri Gambrell.

**OPINION**

In 1991, Joe and Jeri Gambrell (Mr. Gambrell, Ms. Gambrell, or the Gambrells) purchased approximately 69 acres[1] in Fayette County and subdivided the parcel into four (4) lots, selling three (3) of them, and retaining one (1), twenty-one acre lot for themselves. In September of 1992, they sold the subject lot to Mr. Frank Foshee (Mr. Foshee). In the deed to Mr. Foshee, the Gambrells left blank the space reserved for reciting encumbrances on the property. Instead, they attached to the

---

[1]The land purchased by the Gambrells was not encumbered by restrictive covenants.

deed an untitled, undated, and unsigned page listing the restrictions and recorded it along with the deed. The deed made no mention of the attachment, nor did the text of the attachment refer to the deed. The attachment set forth, in pertinent part, the following:

1.　　THESE COVENANTS ARE TO RUN WITH THE LAND AND SHALL BE BINDING ON ALL PARTIES AND ALL PERSONS CLAIMING UNDER THEM FOR A PERIOD OF THIRTY YEARS FROM THE DATE THESE COVENANTS ARE RECORDED . . . .

2.　　ENFORCEMENT – ENFORCEMENT SHALL BE BY A PROCEEDING AT LAW OR IN EQUITY AGAINST ANY PERSON OR PERSONS VIOLATING OR ATTEMPTING TO VIOLATE ANY COVENANT, EITHER TO RESTRAIN VIOLATION OR TO RECOVER DAMAGES.

. . . .

4.　　LAND USE AND BUILDING TYPE – NO LOT SHALL BE USED EXCEPT FOR RESIDENTIAL PURPOSES. NO MOBILE, MODULAR, OR PREFAB HOMES SHALL BE PERMITTED . . . .

. . . .

8.　　THE OWNER OF EACH LOT(S) SHALL BE RESPONSIBLE AND HELD LIABLE FOR MAINTAINING, WHETHER OR NOT ANY IMPROVEMENTS HAVE BEEN MADE THEREON, THE CONDITION OF HIS/ITS LOT(S), INCLUDING BUT IN NO WAY LIMITED TO, CLEARING OF ANY TRASH OR LITTER, HAVING THE GRASS CUT TO A REASONABLE LENGTH AND KEEPING THE PROPERTY IN A GENERAL STATE OF REPAIR SO AS NOT TO DISTURB OR AESTHETICALLY OFFEND THE CHARACTER OF THE SURROUNDING LOT(S).

9.　　NO NOXIOUS OR OFFENSIVE TRADE OR ACTIVITY SHALL BE CARRIED ON UPON ANY LOT, NOR ANYTHING BE DONE THEREON WHICH MAY BE OR BECOME AN ANNOYANCE OR NUISANCE TO THE NEIGHBORHOOD.

The Gambrells employed this format for the first two lots they sold but expressly incorporated the attachment in the 1993 deed conveying the third lot. They placed the same restrictions, verbatim, upon all three lots.

Mr. Foshee conveyed his lot to Sonny and Carrie Nivens (Mr. Nivens, Ms. Nivens, or the Nivenses) by warranty deed in May of 1996. The deed affirmatively recited that there were no

encumbrances.[2]  When Mr. Foshee first placed the property on the market, he provided Mary Foster (Ms. Foster), his real estate agent, a copy of the restrictions.  She, in turn, provided a copy of them to Mary Ann Tapp (Ms. Tapp), the real estate agent for the Nivenses and discussed them with Ms. Tapp during the negotiation phase.  Although the Nivenses disputed the evidence and testimony on this issue at trial, Ms. Tapp testified that she provided them a copy of the covenants prior to the purchase but acknowledged she could not remember discussing the issue with them.   As noted below, even though the trial court found that the Nivenses had actual notice of the restrictions, they do not dispute this finding on appeal.

The Nivenses had begun to build a large wedding chapel and facility, known as Carahills Estate, when the Gambrells filed suit on February 18, 1998, to enforce the purported restrictions and enjoin the Nivenses from completing the chapel's construction and using it for commercial purposes.[3]  The Gambrells sought injunctive relief and $50,000 in damages.  The Nivenses filed their answer on April 22, 1998, contending that the lot they purchased was unencumbered, that the "protective covenants" did not run with the land, and that they had no notice of the protective covenants when they took title to the property.  In addition, they relied upon their acquisition of a special exception to the residential zoning of the area.  On January 13, 2001, the trial court granted summary judgment in favor of the Nivenses, finding that the attachment to Mr. Foshee's deed was not properly authenticated and had no legal effect upon the state of the title.  Then, on June 15, 2001, on plaintiff's motion, the trial court modified that order and granted partial summary judgment to the Nivenses on the issue of constructive notice only, reserving the issue of actual notice for trial.

The matter proceeded to a bench trial on April 4, 2003, after which the trial court concluded that the Gambrells were entitled to enforce the restrictions because the Nivenses had actual notice of them prior to the transfer of title.  The trial court found that the attachment was stamped as part of the warranty deed when recorded and, at least, constituted a cloud on title.  Further, it found that the Nivenses received actual notice of the covenants during their negotiations with Mr. Foshee and that Ms. Tapp's knowledge of the covenants should also be imputed to them.  The court declined to award damages but reserved the issue of the proper remedy for "such time as the Court's judgment becomes final."

Following the trial court's denial of their motion to alter or amend, the Nivenses filed a notice of appeal, which this Court dismissed for lack of a final judgment, as the trial court had not entered judgment on the remedy.  On November 13, 2006, the trial court conducted a hearing in which the Nivenses proffered evidence that they, along with the owners of the other two lots, had executed and recorded a mutual release and waiver regarding the covenants two months prior to the hearing.  In

---

[2]The Nivenses emphasize that their sale contract with Mr. Foshee was contingent upon their acquiring permission to operate a wedding service on the property.  This point pertains to whatever grievance the Nivenses may have with Mr. Foshee, which is not at issue in this case.

[3]According to the trial court's findings, Mr. Gambrell called Mr. Nivens when he learned that the Nivenses had broken ground to start construction on the chapel.  Mr. Nivens told Mr. Gambrell that he did not believe they were violating the covenants because the "Fayette County Planning office" had given them permission to build the chapel there.  The Gambrells then filed suit.

that document, the parties waived any breaches of the purported covenants related to the wedding services, and the landowner neighbors expressly consented to the Nivenses' operation of the wedding chapel.

Nonetheless, the trial court issued a permanent injunction prohibiting the Nivenses from operating the chapel or any other commercial enterprise on their property. It stayed enforcement, *sua sponte*, pending this appeal. Final judgment was entered on December 5, 2006, and the Nivenses filed their notice of appeal on December 14, 2006.

### Issues Presented

The Nivenses raise four issues, as restated below, for our review:

(1)     Whether Plaintiffs are estopped by their warranty deed, which covenanted that there were no encumbrances, from enforcing restrictive covenants they attempted to place on the property against remote grantees;

(2)     Whether unsigned "protective covenants" attached to, but not incorporated into a deed, run with the land and are enforceable against remote grantees when every deed in the remote grantees' chain of title expressly covenanted that the property was unencumbered;

(3)     Whether an equitable servitude exists; and

(4)     Whether the "protective covenants" have been released.

The Gambrells frame the issue on appeal as follows:

Whether the Protective Covenants, including the provision that "no lot shall be used except for residential purposes," are enforceable against Defendants/Appellants, Sonny Nivens and Carrie Nivens . . ., where the Nivenses had actual knowledge of the Protective Covenants well before they purchased the real property [at issue].

### Standard of Review

In appeals of cases tried without a jury, our standard of review is *de novo* upon the record; we accord a presumption of correctness to the trial court's findings of fact and will disturb those findings only where the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S .W.3d 291, 296 (Tenn. Ct. App. 2001). In contrast, we review the trial court's legal conclusions *de novo*, with no presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn.1997).

-4-

*Analysis*

The resolution of this dispute requires us to address three issues.  First, we must consider whether the Gambrells are estopped from denying the language on the face of the Gambrell-Foshee deed indicating there are no encumbrances on the property.  Second, we must determine whether the restrictive covenants are enforceable as an equitable servitude.  Finally, we address the Nivenses' alternative argument that, even if the restrictions were enforceable, they have since been released or otherwise terminated.  For the following reasons, we conclude that estoppel by deed does not apply in this case, that the trial court properly imposed an equitable servitude under these unusual facts, and that the restrictions continue to bind the Nivenses.

*Estoppel by Deed*

The Nivenses first assert that our holding in *Patterson v. Cook*, 655 S.W.2d 955 (Tenn. Ct. App. 1983), controls this case.  In *Patterson*, this Court held that the equitable doctrine of estoppel by deed prevented the plaintiff/grantor from enforcing restrictive covenants that contravened the deed's recital that the land was unencumbered. *Patterson*, 655 S.W.2d at 958.  "Estoppel by deed is a bar which precludes one party to a deed and his privies from asserting as against the other party and his privies any right or title in derogation of the deed or from denying the truth of any material facts asserted in it." *Id.* (quoting 19 Am. Jur. *Estoppel* § 6).  According to the Nivenses, this authority compels the conclusion that the language in the Gambrells' deed to Mr. Foshee estops them from denying the lot is unencumbered and from enforcing the covenants altogether.  We disagree.

First, the facts of *Patterson v. Cook* differ from the determinative ones here.  In *Patterson*, the original grantor who had subdivided property into many tracts filed suit against one of her grantees, the owner of two adjacent tracts in the subdivision, to enjoin the construction of a greenhouse allegedly intended for commercial use. *Id.* at 957.  The defendant/grantee had purchased his lots at different points in time.  He took title to the first lot by a deed specifically incorporating restrictions set forth in a defectively recorded instrument. *Id.* at 957.  He purchased the second lot, the location of the prospective greenhouse, thereafter, and took title by a general warranty deed affirmatively reciting that the lot was unencumbered. *Id.*  Although the instrument creating the restrictions also listed the second tract by number, it was not of record and did not impart constructive notice. *Id.* at 959.  This Court stated that "[i]t seems grossly unfair for the grantor . . . on the one hand to promise the grantee . . . that the property is unencumbered, and then, on the other hand, seek to enforce an encumbrance that the grantor herself placed upon the property." *Id.* at 958.

In *Patterson,* the dispute involved the original parties to a conveyance in which the grantor had abandoned the incorporation language from the first deed in favor of an affirmative recital that the land was unencumbered.  There, the defendant purchased adjacent lots from the same person who, in the first deed, incorporated restrictions that were not of record.  In the second deed, the (same) grantor affirmatively recited the lot was unencumbered.  In contrast, the original parties to this transaction, the Gambrells and Mr. Foshee, do not dispute that Mr. Foshee purchased his lot

encumbered by these covenants. Moreover, unlike the plaintiff/grantor in *Patterson*, the Gambrells did not incorporate restrictions into the first deeds they executed, only to abandon such language in later conveyances.

Second, the most striking contrast arises from the undisputed finding that the Nivenses had actual notice of the restrictions. Generally, factual assertions contained in a deed bind the grantor and the grantee. *Duke v. Hopper*, 486 S.W.2d 744, 748 (Tenn. Ct. App. 1972). To assert estoppel, however, a party damaged by a false factual assertion must establish (1) its lack of knowledge, without fault, of the true facts, (2) its reliance upon the false factual assertion, and (3) its consequent action based upon that untrue statement. *Id.* Indeed, reasonable reliance lies at the heart of every estoppel claim, and the instant facts fall far short of satisfying this requirement. The trial court expressly found that the Nivenses had actual notice of the restrictions prior to executing the sale contract, but they do not dispute this finding on appeal. They could not have reasonably relied on the face of the Gambrell-Foshee deed when they had actual notice of the restrictions. Accordingly, our holding in *Patterson* does not apply in this case, and the trial court's finding of actual notice precludes the application of estoppel by deed in this dispute.

### *Enforceability of the Covenants as an Equitable Servitude*

The Nivenses additionally argue that the covenants cannot be enforced as an equitable servitude because there was no common plan of development and because the Gambrells did not similarly restrict the lot they retained. They support this assertion in part by claiming that the Gambrells have failed to abide by these covenants, as evidenced by the excessive grass length on their lot and by the strategic discharge of Mr. Gambrell's shotgun during one of the wedding ceremonies. We conclude, however, that we need not address these questions because the unusual facts of this case independently establish the elements of an equitable servitude.

### *Substantive Elements of the Equitable Servitude*

An owner of land may sell portions of it and make restrictions as to its use for the benefit of himself as well as for the benefit of those to whom he sells. *Laughlin v. Wagner*, 244 S.W. 475 (Tenn. 1922); *Benton v. Bush*, 644 S.W.2d 690, 691 (Tenn. Ct. App. 1982). Even though Tennessee law does not favor private restrictions upon the use and enjoyment of land, our courts will enforce the covenants as they would contracts, according to the clearly expressed intention of the parties. *Benton*, 644 S.W.2d at 691; *Carr v. Trivett*, 143 S.W.2d 900, 903 (Tenn. Ct. App. 1940). Covenants that fail the more exacting requirements for real covenants at law may still be enforced in equity as an equitable servitude. An equitable servitude is a "covenant respecting the use of land enforceable against successor owners or possessors in equity regardless of its enforceability at law." 2 *American Law of Property* § 9.31 (A.J. Casner ed. 1952). This Court has noted that

> [w]here an owner of land enters into a contract that he will use or abstain from using his land in a particular way or manner, equity will enforce the agreement against any purchaser or possessor with notice who attempts to use the land in violation of its

> terms, irrespective of whether the agreement creates a valid covenant running with the land at law or not.

*Tennsco Corp. v. Attea*, No. M2001-01378-COA-R3-CV, 2002 WL 1298808, at *2 (Tenn. Ct. App. June 13, 2002) (*no perm. app. filed*) (quoting 2 *American Law of Property* § 9.24 (A.J. Casner ed. 1952)). For a covenant to bind remote grantees in equity, (1) it must "touch and concern" the land; (2) the original parties to the covenant must intend that it run with the land and bind remote grantees; and (3) the remote grantee must have had notice of the covenant. *Id.* at *1-*2 (quoting 5 Richard R. Powell & Patrick J. Rohan, *The Law of Real Property* § 673 (1991)). To have binding effect, valid restrictions on property need not be in the chain of title if the purchaser had actual notice of them. *Land Developers, Inc. v. Maxwell*, 537 S.W.2d 904, 913 (Tenn. 1976); *Ridley v. Haiman*, 47 S.W.2d 750, 752 (Tenn. 1932); *Stracener v. Bailey*, 737 S.W.2d 536, 539 (Tenn. Ct. App. 1986). Nonetheless, even where the remote grantee takes title with actual notice, the first two requirements - - that the covenant "touch and concern" the land and that the original parties intend the covenant to run - - must still be established.

The instant facts satisfy each element with ease. First, and most fundamental, is the covenant itself, as the equitable servitude arises out of a promise. The record reveals that a central element of the Gambrell-Foshee conveyance was Mr. Foshee's covenant to restrict the use of his property. We agree with the Nivenses' assertion that the attachment creating the restrictions is not part of the deed itself. Under Tennessee law, undated and unsigned writings located below the signatures and the certificate of acknowledgment in a deed do not constitute part of that deed. *Anderson v. Howard*, 74 S.W.2d 287, 390 (Tenn. Ct. App. 1934). To conclude otherwise would "open wide the door to the perpetration of fraud." *Id.* But there is no dispute regarding the agreement between the Gambrells and Mr. Foshee at the time of the conveyance. The record makes clear that the language of the deed itself did not express the true intention of the parties. In his deposition,[4] Mr. Foshee unequivocally stated that the terms of their contract included the restrictions, that he understood the restrictions would run with the land for thirty years, and that the list was attached to the deed and duly recorded. Despite the omission of encumbrances on the face of the Gambrell-Foshee deed, Mr. Foshee never believed his property to be unencumbered. Certainly, the undated, unsigned, and unacknowledged written covenants fail in form; however, the original covenanting parties confirmed their substance.

Additionally, the language in the attachment clearly expresses an intent that the covenants run with the land and bind remote grantees. The first paragraph of the attached restrictions leaves little doubt in this regard:[5]

---

[4]Mr. Foshee did not testify at trial, but the parties stipulated to the admissibility of his deposition.

[5]The Nivenses advance arguments that pertain only to the running of the covenant's burden, not of its benefit; specifically, with respect to the Gambrells' lot, they argue only that it was not similarly burdened. They do not raise the issue of whether the Gambrells intended the benefit of the restrictions to run with their retained land or to inure to them personally. Accordingly, we will not address whether an equitable servitude can exist when, even though the burden

(continued...)

1. THESE COVENANTS ARE TO RUN WITH THE LAND AND SHALL BE BINDING ON ALL PARTIES AND ALL PERSONS CLAIMING UNDER THEM FOR A PERIOD OF THIRTY YEARS FROM THE DATE THESE COVENANTS ARE RECORDED . . . .

Further, the restrictions "touch and concern" the land. Although there is some dispute among authorities as to the test for this requirement, there is little question that building restrictions embodied in a covenant between owners in fee satisfy this test, both as to the benefit and the burden. *Tennsco Corp.*, 2002 WL 1298808, at *2. And, finally, as noted above, the Nivenses do not dispute the trial court's finding that they had actual notice of the covenants well before accepting the deed from Mr. Foshee.

Indeed, the case at bar is strikingly similar to the landmark English case of *Tulk v. Moxhay*, in which the court enforced restrictions on equitable principles even though the covenants did not meet the requirements for enforcement at law. There, the owner of property conveyed to his purchaser the area known as Leicester Square and included in the deed the covenant that the grantee, his heirs, and assigns, would keep the area as a garden for the benefit of the residents in the area. The grantor, still owning land adjacent to the square, sued a remote grantee, whose deed did not contain the restriction, but who admitted he took title with notice of it. The court stated:

> Here there is no question about the contract: the owner of certain houses in the square sells land adjoining, with a covenant from the purchaser . . . And it is now contended, not that the vendee could violate the contract, but that he might sell the piece of land, and that the purchaser from him may violate it without this Court having any power to interfere. If that were so, it would be impossible for an owner of land to sell part of it without incurring the risk of rendering what he retains worthless. It is said that, the covenant being one which does not run with the land, this court cannot enforce it; but the question is, not whether the covenant runs with the land, but whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased. . . .
>
> That the question does not depend upon whether the covenant runs with the land is evident from this, that if there was a mere agreement and no covenant, this Court would enforce it against a party purchasing with notice of it; for if an equity is attached to the property by the owner, no one purchasing with notice of that equity can stand in a different situation from the party from whom he purchased.

*Tulk v. Moxhay*, 2 Phillips 774, 41 Eng. Rep. 1143 (1848), *quoted in Stracener*, 737 S.W.2d at 537–38. Like the plaintiff grantor in *Tulk v. Moxhay*, the Gambrells are similarly suing upon written

---

[5](...continued)
inheres in the land, the benefit is in gross (i.e., personal to the covenantee).

covenants of which the defendant took title with actual notice. Additionally, the language of the covenants in this case, like that in *Tulk*, establishes that the restrictions "touch and concern" the land and that the covenanting parties intended to bind the successors and assigns of the grantee.

*Equitable Servitudes and the Plan of Development*

Although the Nivenses do not dispute the finding of actual notice, they argue that more than actual notice is required for the court to enforce the restrictions as an equitable servitude, specifically pointing to the need for a common plan of development and the requirement that the grantor's retained land be similarly restricted. Couching their challenge in terms of standing,[6] the Nivenses chiefly rely on three cases to prove that the Gambrells cannot enforce the restrictions in equity. First, we see no issue of standing here, as the Gambrells were original parties to the transaction creating the covenants and still owned a portion of the land. Second, although our existing case law on the subject emphasizes the need for a common plan of development, the facts before those courts otherwise lacked proof of some substantive element of an equitable servitude. In those cases, the common plan of development provided a basis for the courts to extend the restrictions by implication. The instant facts suffer no such deficiency. We now turn to, and distinguish, the Nivenses' chief cases: *Land Developers, Inc. v. Maxwell*, *Ridley v. Haiman*, and *Tennsco Corp. v. Attea*.

In certain circumstances, a general development plan allows a court to imply the promise to restrict the use of one's own property when none is otherwise apparent. In *Land Developers*, grantees and remote grantees sued to enforce restrictions against the common grantor who had retained a portion of the original land without placing express restrictions upon it. *Land Developers, Inc. v. Maxwell*, 537 S.W.2d 904 (Tenn. 1976). There, the Tennessee Supreme Court held, in pertinent part, that where a grantor had subdivided his land, sold tracts to various grantees according to a general development plan, and placed identical restrictive covenants in the deeds to the grantees, the land remaining in the grantor's possession was similarly restricted. *Id.* at 913. When the original purchasers acquired their encumbered lots with the understanding that the use of the other lots would conform to a uniform plan, they also acquired a reciprocal negative easement[7] in the acreage retained by the grantor. *See id.* Accordingly, they could enforce, in equity, similar restrictions upon the grantor's use of that property. *See id.* In that case, even though it was unclear whether the grantor had ever intended or promised to conform to the same restrictions noted in the grantees' deeds, equity extended the restriction by implication. Here, the Gambrells, common grantors, are suing

---

[6]The doctrine of standing addresses whether a particular plaintiff is entitled to seek judicial relief. *Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn. 1976); *Garrison v. Stamps*, 109 S.W.3d 374, 377 (Tenn. Ct. App. 2003). The court must determine whether, according to the party's allegations, the plaintiff has a sufficiently personal stake in the outcome of the dispute to justify judicial resolution of it. *SunTrust Bank v. Johnson*, 46 S.W.3d 216, 222 (Tenn. Ct. App. 2000); *Browning-Ferris Indus. of Tenn., Inc. v. City of Oak Ridge*, 644 S.W.2d 400, 402 (Tenn. Ct. App. 1982).

[7]A reciprocal negative easement is a form of equitable servitude. *See Land Developers*, 537 S.W.2d at 912; *Leach v. Larkin*, No. 919193, 1993 WL 377629, at *3 (Tenn. Ct. App. Sept. 24, 1993)(characterizing the reciprocal negative easement as the "technical name of the grantees' interests arising from these restrictive covenants").

upon an express promise made by Mr. Foshee. There is no question that Mr. Foshee promised to use his land in conformance with the restrictions or that the parties intended that his lot be encumbered.

A general development plan can also confer standing to a third party[8] to sue for enforcement when the defendant's deed does not expressly extend the restriction's benefits to anyone other than the grantor. For example, *Ridley v. Haiman* involved the question of whether one grantee could enforce restrictions against another grantee (e.g., had standing to sue) where the plaintiff grantee was a stranger to the conveyance from the common grantor to the defendant grantee, and where the deed between the two did not identify the beneficiaries of the restrictions. *Ridley v. Haiman*, 47 S.W.2d 750, 753 (Tenn. 1932). The Tennessee Supreme Court announced that "where the owner of a tract of land subdivides it and sells the different lots to separate grantees, [and restricts] the use of the lot[s] conveyed . . . in accordance with a general building, improvement, or development plan, such restrictions may be enforced by any grantee against any other grantee." *Id.* Certainly, if the restrictions placed upon one lot were not intended to benefit the lot of another purchaser in the area, that lot owner could not sue to enforce the restriction. Yet, where there is a general plan of development and the several purchasers acquire encumbered lots (from a common grantor) with the expectation that the use of the land will conform to that scheme, they also acquire reciprocal negative easements in all other lots. *See id.*

> [A grantor's] intention to make restrictive covenants mutually binding upon the [purchasing] parties and their successors and assigns need not be spelled out within the four corners of the deed[;]. . . such intention may be gathered from the circumstance of a uniform building, improvement and development plan[.]

*Owenby v. Boring*, 276 S.W.2d 757, 761 (Tenn. Ct. App. 1954). Notably, the court in *Ridley* expressly distinguished the facts before it from others in which the common grantor brought suit against a grantee or remote grantee. *Ridley*, 47 S.W.2d at 753. We make the same distinction here.

The status of the parties as grantors or grantees and their procedural posture in this dispute distinguish this case from both *Ridley* and *Land Developers*. For example, in contrast to the facts in *Ridley*, this dispute involves the common grantors, not a grantee, seeking to enforce restrictions attached to a deed to which they were parties. Inquiry into a common plan of development would be proper in this case if the Nivenses had sued the Gambrells to enforce the same restrictions upon their use of the land or, likewise, if a neighboring landowner (grantee) had sued the Nivenses to enjoin their operation of the wedding chapel. Obviously, we find this case in a different posture.

Finally, a common plan of development may serve to establish the covenanting parties' intent to bind remote grantees when the written restrictions do not incorporate the "heirs and assigns"

---

[8]One who seeks enforcement in such a situation must prove (1) that both parties derived title from a common grantor; (2) that the vendor sold the lots with restrictions conforming to a general plan of development; (3) that the vendor intended the restrictions to benefit all the lots sold, whether or not extended to the land retained by him; and (4) that both parties (or their predecessors) purchased their lots with the understanding that the restrictions were intended to benefit all other lots in the development plan. *See Ridley v. Haiman*, 47 S.W.2d 750, 755 (Tenn. 1932).

language required for real covenants at law. Two cases from this jurisdiction illustrate the need for a development plan when the restrictions themselves fail to evidence the parties' intent to bind successors. In *Tennsco Corp. v. Attea*, a landowner subdivided his property into three lots, retained the middle lot, and sold the other two lots with the following deed restriction:

> This conveyance is made subject to the restrictions that any buildings constructed on the land shall be single family dwellings of traditional design at least 4,000 square feet in size and on lots of one (1) acre or greater.

*Tennsco Corp. v. Attea*, No. M2001-01378-R3-CV, 2002 WL 1298808, at *1 (Tenn. Ct. App. June 13, 2002)(*no perm. app. filed*). After the grantor sold the lot he had originally retained, his successor then brought suit against a remote grantee who had taken title to the adjoining lot by an unrestricted deed. *Id.* The restriction in the deed delivered to the original purchaser was unenforceable as a real covenant at law because it did not expressly bind the heirs, successors, and assigns of the grantee, as required under Tennessee law. *Id.* at *2. This Court also declined to approve enforcement of the restriction as an equitable servitude because it did not appear that the grantor had restricted and conveyed the lots according to a general plan of development. *Tennsco Corp.*, 2002 WL 1298808, at *2. This Court concluded that the restriction in the original deed was personal to the parties, inuring to the grantor's benefit. *See id.* at *3. Indeed, nothing in the record established the covenanting parties' intent to bind remote grantees. Similar to the holding in *Tennsco*, our conclusion in *Essary v. Cox*, 844 S.W.2d 169 (Tenn. Ct. App. 1992), was to deny enforcement of the restrictions in equity where the restriction in the deed lacked the "heirs and assigns" language and where there was no common plan of development. *Essary*, 844 S.W.2d at 172. There we held that "[a]bsent express language indicating that the parties intended for the restriction on the sale of oil and gas products to apply to the parties' successors and assigns, this Court is unwilling to interfere with Defendants' free and unrestricted enjoyment of their property." *Id.* In contrast, we now consider a dispute in which the written covenants contain this express language.

The covenants in *Tennsco* and *Essary* failed to express a substantive element of a real covenant at law: the intent to bind successors, heirs, and assigns. Equity requires proof of the same substantive intent but does not confine the scope of inquiry to the language of the covenant itself. Nonetheless, *Tennsco* and *Essary* together stand for the proposition that our courts will broaden the scope of inquiry only where the vendor imposed the restrictions according to a general plan of development. A development plan logically supports a finding that the parties intended the covenant to run with the land and bind the grantees' successors, assigns, and heirs. The very concept of a development plan and the consequent expectations of the purchasers require the individual burdens and their corresponding benefits to inhere in the land and to benefit and bind whoever occupies that land. This much seems implicit, for a common plan would crumble if the burdens and benefits were merely personal to the contracting parties.

The facts in *Essary*, in particular, bear an important likeness to - - as well as a determinative difference from - - the ones at bar. In both cases, the grantor, not the grantee, sought legal and equitable enforcement of the restrictions against a remote grantee. Yet, the covenants in each case

were unenforceable at law for quite different reasons. In *Essary*, the restrictions failed in substance, as noted above. Unlike the written covenants in *Essary* that omitted the express intent to bind successors, heirs, and assigns, the covenants attached to the Gambrell-Foshee deed made this intent explicit. Instead, the Gambrell-Foshee covenants reveal a defect in form only, as they were omitted from the deed and instead set forth on an undated, unsigned, and unacknowledged document.

Where restrictive covenants are unenforceable at law because of some defect in substance, our courts may enforce the restrictions in equity where the common grantor has restricted and conveyed the property according to a plan of development. *See, e.g., Land Developers*, 537 S.W.2d 904, 913 (Tenn. 1976)(extending by implication covenant's restriction to land retained by grantor); *Ridley*, 47 S.W.2d 750,753 (Tenn. 1932)(allowing grantee to enforce restrictions against another grantee by implying from development plan the parties' intent to benefit all lots within the plan). Where, as here, the covenants fail at law from a defect in form but otherwise satisfy the substantive elements of an equitable servitude, there is no need to inquire into the existence of a common plan of development. We conclude that the Gambrell-Foshee deed and its attached restrictions were deficient in form but substantively supported the imposition of an equitable servitude. Accordingly, the trial court did not err in restricting the use of the Nivenses' property.

### *Release of Covenants*

Finally, the Nivenses contend that, even if the covenants were binding, they have since been released. They primarily assert that the mutual waiver and release executed by the Nivenses and their neighbors, owners of the other two lots, terminated the operation of the restrictions. The release of restrictive covenants requires the assent of those for whose benefit they were imposed. *See Ridley*, 47 S.W.2d at 752. Without a release executed by the Gambrells, the undeniable beneficiaries of the subject restrictions, we fail to see how this release could impact the viability of the covenant between the Gambrells and Mr. Foshee, the Nivenses' predecessor in interest.

The Nivenses also contend that the restrictions are no longer valid because they have ceased to serve a useful purpose. Specifically, they rely upon the change in zoning to support this point. We disagree. "While rezoning of property covered by a restrictive covenant is some evidence of a change in the character of the use of the property, rezoning alone does not require the courts to conclude that the restrictive covenant no longer serves a useful purpose." *Hewgley v. Vivo*, No. 01-A-01-9506-CH-00266, 1997 WL 92077, at *2 (Tenn. Ct. App. Mar. 5, 1997) (*quoting, inter alia, Hysinger v. Mullinax*, 319 S.W.2d 79, 82 (Tenn. 1958)). We not only disagree with the Nivenses' overall assertion, but we also note that rezoning of the area did not occur here. Rather, the Nivenses secured an *exception* to the zoning ordinance. We therefore reject their contention that the covenants have been released or otherwise terminated.

### *Conclusion*

We hold that where the language in a restrictive covenant expressly states that the parties intend to bind the grantee's successors and assigns and that the covenant shall run with the land,

equity does not require a common plan of development if the grantor is the party seeking enforcement and if the defendant/remote grantee took title with actual notice of the covenants. Moreover, in this case, the defense of estoppel by deed likewise fails; with actual notice, the Nivenses could not have reasonably relied on the absence of listed encumbrances on the face of the Gambrell-Foshee deed. Finally, the mutual release and waiver is ineffective because the Gambrells, the undeniable beneficiaries of the restrictions, did not execute it or in any way agree to its terms. For the foregoing reasons, we affirm the judgment of the trial court and remand the matter for entry of an order dissolving the stay and for further proceedings not inconsistent with this opinion. We tax the costs of this appeal to the Appellants, Sonny Nivens and Carrie Nivens, and their surety, for which execution shall issue if necessary.

_____
DAVID R. FARMER, JUDGE