FILED

12/18/2019

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 17, 2019 Session

**RITCHIE PHILLIPS ET AL. v. MARK HATFIELD**

**Appeal from the Chancery Court for Sullivan County**
**No. 17-CB-25948(C)          E. G. Moody, Chancellor**
————————————————————

**No. E2019-00628-COA-R3-CV**
————————————————————

In this declaratory judgment action involving neighboring landowners in a residential development, the trial court determined that the restrictive covenants applicable to the development would prevent the defendant from constructing a commercial business on his property. The trial court accordingly entered an injunction preventing the defendant from constructing a business on his real property. The defendant has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Edward T. Brading, Johnson City, Tennessee, for the appellant, Mark Hatfield.

Ricky A.W. Curtis, Blountville, Tennessee, for the appellees, Ritchie Phillips and Roma Phillips.

**OPINION**

I. Factual and Procedural History

On April 20, 2017, the plaintiffs, Ritchie and Roma Phillips, filed a "Complaint for Declaratory Judgment and Motion for Immediate, Temporary Injunction" against Mark Hatfield in the Sullivan County Chancery Court ("trial court"). The Phillipses alleged that they owned two parcels of real property in Sunnybrook Addition Subdivision ("Sunnybrook Addition") and that Mr. Hatfield also owned four lots within Sunnybrook Addition. Three of Mr. Hatfield's parcels had road frontage on Highway 11E. The

Phillipses further alleged that Mr. Hatfield also owned an adult bookstore, Intimate Treasures, and that he planned to build a new 4,000-square-foot structure to house this business upon one or more of his parcels in Sunnybrook Addition that abut Highway 11E.

The Phillipses claimed that Sunnybrook Addition was subject to protective covenants and restrictions mandating that the lots be used for residential purposes only. According to the Phillipses, the covenants and restrictions also provide that any lot owner maintains standing to enforce the restrictions by way of private action and that the restrictions would renew every ten years until the majority of property owners chose to rescind or modify them. The Phillipses thus sought to have construction of Mr. Hatfield's nonconforming structure halted.

The trial court conducted a hearing regarding the temporary injunction on May 2, 2017, and subsequently entered an order granting the injunction on May 24, 2017. The court specifically found in its order that the protective covenants for Sunnybrook Addition applied to the lots owned by Mr. Hatfield and that he had notice of same when he purchased the lots because the protective covenants had been recorded prior to his purchase. The court also found that Sunnybrook Addition was subject to a general plan of development. Furthermore, it found, despite Mr. Hatfield's protestations to the contrary, that the nature of the neighborhood had not radically changed in recent years such that the covenants should be vacated. Moreover, the court determined that the Phillipses would be harmed by construction of Mr. Hatfield's proposed retail establishment on his lots. The court therefore issued a temporary injunction halting construction.

On May 25, 2017, Mr. Hatfield filed a motion seeking to dissolve the temporary injunction. Mr. Hatfield also sought, alternatively, an interlocutory appeal to this Court. On May 30, 2017, Mr. Hatfield filed an answer and counterclaim, wherein he denied that the restrictive covenants applied to all of the lots in Sunnybrook Addition or to his lots specifically. Mr. Hatfield raised several affirmative defenses, including failure to state a claim upon which relief could be granted, unclean hands, lack of standing, failure to join indispensable parties, estoppel, and waiver. Mr. Hatfield further stated a counterclaim for damages for, *inter alia*, lost profits and attorney's fees.

On June 21, 2017, the trial court entered an order denying Mr. Hatfield's motion to dissolve the temporary injunction and his request for an interlocutory appeal. The court ordered that the temporary injunction would remain in place and that the Phillipses would file a $5,000 bond, which they accomplished on June 23, 2017. The Phillipses subsequently filed an answer to Mr. Hatfield's counterclaim, denying that he was entitled to any relief.

The trial court conducted a bench trial on January 3, 2019. On April 3, 2019, the court entered an order finding that the Phillipses owned Lots 7 and 8 in Sunnybrook Addition and that Mr. Hatfield owned Lots 1, 2, 3, and a portion of Lot 4. The court determined that Mr. and Ms. J.C. Chambers were the original developers of the "Sunnybrook" neighborhood, which was comprised of three platted developments: Sunnybrook Addition, Sunnybrook Heights, and Sunnybrook Acres. The court further found that Mr. and Mrs. Chambers recorded identical protective covenants for all three developments comprising the Sunnybrook neighborhood in 1955 and 1956. These covenants provided in relevant part that the lots would be designated as residential and would only contain single-family dwellings.

In support of its order, the trial court found that although Lots 1 and 2 had been sold by Mr. and Ms. Chambers prior to the recording of the covenants, Mr. Chambers reacquired those lots in 1955 and 1956. The court further found that since the recording of the protective covenants, Lots 1 through 4 had been sold numerous times and were ultimately purchased by Mr. Hatfield on October 12, 2016. The court specifically noted that Mr. Hatfield's deeds to his lots stated that the conveyances were subject to "valid restrictive covenants and easements, if any, appearing of record."

The trial court found that Lots 1 through 4 had not been used for a non-residential purpose since the inception of Sunnybrook, although a billboard had been erected on Lot 3. The court determined that Mr. Chambers was the original, common grantor for all of Sunnybrook neighborhood, including Sunnybrook Addition, and that he maintained a general plan of development, intending for the restrictive covenants to apply to all of Sunnybrook Addition. The court also found that Mr. Hatfield had constructive notice of the restrictions because they were publicly recorded. The court therefore declared that an implied negative reciprocal easement existed, which applied to Mr. Hatfield's property, and that a retail shop would be in violation of those covenants. The court accordingly ordered that the temporary injunction against Mr. Hatfield be made permanent. Mr. Hatfield timely appealed.

## II. Issues Presented

Mr. Hatfield presents the following issues for our review, which we have restated slightly:

1.  Whether the trial court erred by determining that the protective covenants for Sunnybrook Addition, recorded in the Sullivan County Register's Office, applied to Mr. Hatfield's lots.

2.  Whether the trial court erred by determining that Mr. Hatfield's lots were restricted by virtue of a negative reciprocal easement.

3.      Whether the trial court erred by enjoining Mr. Hatfield from constructing any retail or other business or commercial enterprise on his lots when the protective covenants have been rendered invalid due to abandonment or changed conditions within the subdivision.

4.      Whether the trial court erred by taxing costs to Mr. Hatfield.

The Phillipses raise the following additional issue:

5.      Whether Mr. Hatfield has waived consideration of the trial court's decision to tax costs to him by failing to provide any legal authority or argument supporting his position in his appellate brief.

### III.  Standard of Review

We review a non-jury case *de novo* upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). We review questions of law *de novo* with no presumption of correctness. *Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)); *see also In re Estate of Haskins*, 224 S.W.3d 675, 678 (Tenn. Ct. App. 2006). We afford deference to the trial court's credibility assessments of the witnesses. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 784 (Tenn. 1999).

As this Court has previously explained concerning restrictive covenants:

Construction of a restrictive covenant is also a question of law, which we review de novo with no presumption of correctness. *Hughes v. New Life Dev. Corp.* (*Hughes II*), 387 S.W.3d 453, 480-81 (Tenn. 2012). "Tennessee law does not favor restrictive covenants because they are in derogation of the rights of free use and enjoyment of property." *Id*. at 474-75. Thus, our courts strictly construe restrictive covenants and resolve any doubt concerning the applicability of a restrictive covenant against the restriction. *Id*. at 481. Ambiguities will be construed "against the party seeking to enforce the restriction and in a manner which advances the unrestricted use of the property." *Id*.

Still, in appropriate cases, restrictive covenants, like any other contract, "will be enforced according to the clearly expressed intention of the parties." *Benton v. Bush*, 644 S.W.2d 690, 691 (Tenn. Ct. App. 1982).

- 4 -

When properly created, restrictive covenants run with the land and are "binding on remote grantees if they appear in the chain of title or if the grantee had actual notice of them when the grantee acquired title." *Hughes v. New Life Dev. Corp.* (*Hughes I*), No. M2008-00290-COA-R3-CV, 2009 WL 400635, at *3 (Tenn. Ct. App. 2009).

*Lutzak v. Phoenix Am. Dev. Partners, L.P.*, No. M2015-02117-COA-R3-CV, 2017 WL 4685300, at *4 (Tenn. Ct. App. Oct. 18, 2017).

IV. Applicability of Protective Covenants

The overarching issue raised by Mr. Hatfield on appeal concerns the applicability of protective covenants containing residential use restrictions to the lots owned by Mr. Hatfield. Mr. Hatfield argues that the protective covenants applicable to Sunnybrook Addition, recorded in 1955, do not encumber title to his lots because the developers did not own these lots at the time of the covenants' recordation and because subsequent deeds conveying these lots did not specifically reference the covenants. The proof introduced at trial demonstrated that the original 1953 conveyances by the Chamberses of the lots now owned by Mr. Hatfield contained language restricting the lots solely to residential use for a period of twenty years. In 1955, the Chamberses recorded protective covenants applicable to Sunnybrook Addition. These protective covenants also provided that "[a]ll lots" in the subdivision "shall be known and designated as residential lots," containing only "one detached single family dwelling . . . and a private garage." The recorded document outlining the protective covenants stated that it was applicable to "lots in the entire sub-division, but no further or otherwise" and that the covenants were intended as "protection of purchasers of lots . . . in order to establish a sound value for these lots."

Although the Chamberses later reacquired all or part of the lots now belonging to Mr. Hatfield, subsequent deeds conveying title to the lots did not specifically reference the recorded protective covenants. Mr. Hatfield's deeds for the lots in question do generally state, however, that the conveyances are "subject to valid restrictive covenants and easements, if any, appearing of record." At trial, Mr. Hatfield presented expert witness testimony from Tim Scott, a local attorney with a practice emphasis on examination of real estate titles, who stated that he had examined the title to the four lots in question from 1946 forward. Following his delineation of the various conveyances leading to Mr. Hatfield's ownership of the lots, Mr. Scott opined that the 1955 protective covenants did not appear in the chain of title for the parcels. Mr. Scott was the only witness to testify at trial, and the trial court credited his unrefuted testimony on this point.

Based on its determination that the protective covenants did not appear in the chain of title for the lots in question, the trial court did not find the existence of express restrictive covenants applicable to the lots. *See Lutzak*, 2017 WL 4685300, at *5. Rather, the court determined that the restrictions encumbered title to Mr. Hatfield's lots

by virtue of an implied negative reciprocal easement. As such, we will limit our review of the issue of whether Mr. Hatfield's lots are restricted to whether the trial court properly found the existence of an implied negative reciprocal easement.

Although Tennessee courts have long recognized the doctrine of negative reciprocal easements, they have also noted that this doctrine is to be "applied with great care." *See Land Developers, Inc. v. Maxwell*, 537 S.W.2d 904, 913 (Tenn. 1976); *see also Ridley v. Haiman*, 47 S.W.2d 750, 755 (Tenn. 1932). The doctrine has been explained as follows:

> A property owner may sell off parcels of a tract to different persons and may include in the deeds restrictive covenants for the benefit of not only the property owner but also the other persons who buy portions of the tract. In this circumstance, the grantees acquire not an absolute and unqualified title to their respective parcels, but rather a title limited by the restrictions contained in the deed. *Land Developers, Inc. v. Maxwell*, 537 S.W.2d 904, 912 (Tenn. 1976); *Ridley v. Haiman*, 164 Tenn. 239, 252, 47 S.W.2d 750, 754 (1932); *Laughlin v. Wagner*, 146 Tenn. 647, 653, 244 S.W. 475, 477 (1922). While some ambiguity exists concerning the technical name of the grantees' interests arising from these restrictive covenants, the interest is now commonly known in Tennessee as a reciprocal negative easement. *Land Developers, Inc. v. Maxwell*, 537 S.W.2d at 912; *Ridley v. Haiman*, 164 Tenn. at 252, 47 S.W.2d at 754; *Stracener v. Bailey*, 737 S.W.2d 536, 537-38 (Tenn. Ct. App. 1986).

> Negative reciprocal easements circumscribe the free use of property and, therefore, are not favored even though they have been part of our jurisprudence for many years. *Land Developers, Inc. v. Maxwell*, 537 S.W.2d at 913; *Essary v. Cox*, 844 S.W.2d 169, 171 (1990). The courts enforce them with great care and resolve all ambiguities in favor of the free use of property.

> Both the grantor and the fellow grantees whose titles contain similar restrictive covenants may enforce their reciprocal negative easement rights in either a legal or an equitable proceeding. *Laughlin v. Wagner*, 146 Tenn. at 654-55, 244 S.W. at 477. Grantees seeking equitable enforcement of a reciprocal negative easement must prove: (1) that the parties derived their titles from a common grantor; (2) that the common grantor had a general plan for the property involved; (3) that the common grantor intended for the restrictive covenant to benefit the property involved; and (4) that the grantees had actual or constructive knowledge of the restriction when they

purchased their parcels. *See Ridley v. Haiman*, 164 Tenn. at 256, 47 S.W.2d at 755. [1]

> Grantees seeking judicial enforcement of their negative reciprocal easement rights are not necessarily limited to the recitals in the deeds to prove their case. In addition to the deeds from the common grantor, they may also use recorded plats, or parol evidence of the circumstances surrounding the purchase of the property. *Ridley v. Haiman*, 164 Tenn. at 250, 47 S.W.2d at 753; *Maxwell v. Land Developers, Inc.*, 485 S.W.2d 869, 873 (Tenn. Ct. App. 1972); *Owenby v. Boring*, 38 Tenn. App. 540, 549, 276 S.W.2d 757, 761 (1954).

*Massey v. R.W. Graf, Inc.*, 277 S.W.3d 902, 909-10 (Tenn. Ct. App. 2008) (emphasis and footnote added) (*quoting Leach v. Larkin*, No. 919193, 1993 WL 377629, at *3 (Tenn. Ct. App. Sept. 24, 1993)).

The *Massey* Court also quoted with approval from the Restatement (Third) of Property, which explains:

> The idea underlying the doctrine [of implied reciprocal servitudes] is that when a purchaser buys land subject to restrictions imposed to carry out a general plan of development, the purchaser is entitled to assume that all the land in the development is, or will be, similarly restricted to carry out the general plan. By selling land with restrictions designed to put into effect a general plan of development, the developer impliedly represents to the purchasers that the rest of the land included in the plan is, or will be, similarly restricted. That representation is enforced, on the grounds of estoppel, by imposing an implied reciprocal servitude on the developer's remaining land included in the plan. Because the implied-reciprocal-servitude doctrine undercuts the Statute of Frauds and creates uncertainty in land titles, it should be applied only when the existence of a general plan is clear and establishment of the servitude is necessary to avoid injustice.

*Massey*, 277 S.W.3d at 910-11 (*quoting* Restatement (Third) of Property §2.14(l) (2000)).

In the instant action, the trial court determined that the Phillipses had proven the existence of an implied negative reciprocal easement that restricted the use of Mr.

---

[1] We note that Mr. Hatfield argues in his appellate brief that an additional condition should be placed on the imposition of an implied negative reciprocal easement, namely that the doctrine may only be applied "prospectively to impose restrictions on the 'developer's remaining land'" and cannot be applied to property that was previously conveyed, even if such property returns to the common grantor's hands, as here. Mr. Hatfield cites no mandatory authority for this proposition, however, and we find it to be unavailing under the circumstances presented in this case.

Hatfield's lots to solely residential purposes. Based on our thorough review of the evidence presented in light of the applicable law, we agree.

It is undisputed that the parties herein derived their titles from common grantors, specifically, the Chamberses. *See Massey*, 277 S.W.3d at 910 (explaining that the first requirement for enforcement of an implied negative reciprocal easement is existence of a common grantor). It is also undisputed that the lots in question were contained within Sunnybrook Addition. With regard to the second and third elements necessary to prove the existence of an implied negative reciprocal easement, the trial court found that the Chamberses had a general plan of development concerning the Sunnybrook neighborhood, including Sunnybrook Addition, and that the Chamberses intended for the recorded restrictive covenants for Sunnybrook Addition to apply to all the lots within Sunnybrook Addition.

The proof established that the Chamberses recorded three sets of nearly identical protective covenants in 1955 and 1956, which applied to Sunnybrook Addition, Sunnybrook Heights, and Sunnybrook Acres, respectively. These protective covenants provided that the lots contained within these developments were specifically intended for residential use only. The recorded document outlining the protective covenants stated that it was applicable to the "lots in the entire sub-division, but no further or otherwise" and that the covenants were intended as "protection of purchasers of lots . . . in order to establish a sound value for these lots." We therefore agree with the trial court that the evidence supported the existence of elements two and three. *See Massey*, 277 S.W.3d at 910 (explaining that the second and third requirements for enforcement of an implied negative reciprocal easement are "that the common grantor had a general plan for the property" and "that the common grantor intended for the restrictive covenant to benefit the property.").

Finally, with respect to the fourth element, the trial court determined that Mr. Hatfield held constructive knowledge of the protective covenants because they were publicly recorded and "due to the general nature of the property." We conclude that the evidence supports this determination as well. The protective covenants applicable to Sunnybrook Addition were recorded in the Sullivan County Register's Office in 1955. This Court has often held that a previously recorded instrument pertaining to an interest in property constitutes constructive notice to subsequent purchasers and interested parties who are bound to search for it. *See Burch v. McKoon, Billings & Gold, P.C.*, No. M2004-00083-COA-R3-CV, 2005 WL 2104611, at *7 (Tenn. Ct. App. Aug. 31, 2005).

As the trial court found, Mr. Hatfield's deeds specifically stated that the conveyances of the lots in question were subject to "valid restrictive covenants and easements, if any, appearing of record." Moreover, the various visual representations of Sunnybrook Addition contained within the record demonstrate that it is a neighborhood that is residential in nature. We conclude, as did the trial court, that the language

- 8 -

contained in Mr. Hatfield's deeds coupled with the character of the neighborhood gave rise to the necessity that Mr. Hatfield inquire as to whether any applicable restrictive covenants or easements existed. *See, e.g., Blevins v. Johnson Cty.*, 746 S.W.2d 678, 687 (Tenn. 1988) (determining that a party had notice sufficient to require an inquiry into applicable easements affecting his property based on a recital in his deed excepting all prior easements and general knowledge of a proposed highway project). We therefore conclude that Mr. Hatfield had constructive knowledge of the protective covenants at issue herein. *See Massey*, 277 S.W.3d at 910 (explaining that the fourth requirement for enforcement of an implied negative reciprocal easement is actual or constructive knowledge of the restriction). We determine, based on the evidence presented, that the existence of a general plan of development is clear and that "establishment of the servitude is necessary to avoid injustice." *See id*. at 911. We therefore conclude that the evidence preponderates in favor of the trial court's determination that an implied negative reciprocal easement existed in this matter, such that Mr. Hatfield's lots were subject to the residential-use restriction contained in the protective covenants.

## V. Alleged Abandonment of Covenants

Mr. Hatfield argues that the trial court erred by enjoining him from constructing a commercial building on his lots because any applicable restrictions had been eliminated through abandonment by waiver, estoppel, or acquiescence due to the changed conditions of the neighborhood. As this Court has recognized, the right to enforce restrictive covenants can be lost when:

> [B]y failing to act, one leads another to believe that he is not going to insist upon the covenant, and such other person is damaged thereby, or whereby landowners in a tract or subdivision fail to object to general and continuous violations of restrictions. If the party entitled to the benefit of the covenants in any way by inaction lulls suspicion of his demands to the harm of the other or if there has been actual or passive acquiescence in the performance of the act complained of, then equity will ordinarily refuse aid.

*See Scandlyn v. McDill Columbus Corp*., 895 S.W.2d 342, 349 (Tenn. Ct. App. 1994) (*quoting* 20 Am. Jur. 2d Covenants, Conditions, Etc. § 273 (1965)). The *Scandlyn* Court further explained, however:

> [I]n order for community violation to constitute an abandonment, it must be so general as to frustrate the object of the scheme with the result that enforcement of the restriction involved would seriously impair the value of the burdened lot without substantially benefiting the adjoining lots. Accordingly, sporadic and distant violations do not in themselves furnish adequate evidence of abandonment, although they may be considered in

connection with outside changes. 20 Am. Jur. 2d Covenants, Conditions, Etc. § 272 (1965).

*Id*.

In the case at bar, the only proof concerning this issue came from various exhibits presented by the parties; no testimony was presented regarding any alleged changed conditions in the neighborhood. In his brief, Mr. Hatfield relies upon certain exhibits that he alleges depict changed conditions in Sunnybrook Addition, including documentation demonstrating that the zoning of real properties along the highway was changed from residential to commercial in the 1990s and a letter from the Sullivan County Clerk stating that a business license was issued to one of Mr. Hatfield's predecessors-in-title. The record also contains, however, the affidavits of the Phillipses and Wanda Lynch, another resident of Sunnybrook Addition. These affidavits state that there has never been a business operating within Sunnybrook Addition and that Ms. Lynch has been a resident thereof since 1959.

With regard to the zoning changes, we note that "[w]hile rezoning of property covered by a restrictive covenant is some evidence of a change in the character of the use of the property, rezoning alone does not require the courts to conclude that the restrictive covenant no longer serves a useful purpose." *Gambrell v. Nivens*, 275 S.W.3d 429, 442-43 (Tenn. Ct. App. 2008) (*quoting Hewgley v. Vivo*, No. 01-A-01-9506-CH-00266, 1997 WL 92077, at \*2 (Tenn. Ct. App. Mar. 5, 1997) (*in turn quoting, inter alia, Hysinger v. Mullinax*, 319 S.W.2d 79, 82 (Tenn. 1958))). Accordingly, the only other evidence concerning the "changed conditions" in the neighborhood was that presented by the County Clerk's letter and the affidavits.

In its April 3, 2019 order, the trial court found that "since the inception of Sunnybrook Addition, Lots 1, 2, 3, and 4 have not been used for a non-residential purpose, as no business has operated on the property, although a billboard has been erected on Lot 3 of the property." The evidence presented supports this finding, as well as a determination that any change that has occurred, such as the billboard's existence, is of a "sporadic" nature and does not constitute change "so general as to frustrate the object of the scheme with the result that enforcement of the restriction involved would seriously impair the value of the burdened lot without substantially benefiting the adjoining lots." *See Scandlyn*, 895 S.W.2d at 349. We again note that the visual representations of the neighborhood contained in the record demonstrate its residential character. In addition, at least one non-party resident filed an affidavit stating that no business had ever operated within the subdivision. We further find the proof of issuance of a business license to one of Mr. Hatfield's predecessors-in-title unavailing absent evidence that a business was actually operating on the property in question. In short, Mr. Hatfield has failed to prove such a change in the character of the neighborhood so as to render the restrictions waived or abandoned.

- 10 -

## VI. Waiver of Costs

Mr. Hatfield has also raised on appeal an issue concerning whether the trial court erred by taxing costs to him in its order. As the Phillipses point out, Mr. Hatfield's appellate brief contains no argument or citations to authority concerning this issue. Tennessee Rule of Appellate Procedure 27(a)(7) provides that an appellant's brief must contain an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on." As our Supreme Court has explained, "[a]n issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of Tenn. R. App. P. 27(a)(7)." *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012). This Court has likewise elucidated that an issue may be considered waived when a party has failed to "cite authority for its arguments or to argue the issues in the body of its brief." *See Forbess v. Forbess*, 370 S.W.3d 347, 355 (Tenn. Ct. App. 2011); *see also McGarity v. Jerrolds*, 429 S.W.3d 562, 566 n.1 (Tenn. Ct. App. 2013) ("The failure to cite authority to support an argument on appeal constitutes a waiver of the issue.").

According to our High Court, "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). "[P]arties must thoroughly brief the issues they expect the appellate courts to consider." *Waters v. Farr*, 291 S.W.3d 873, 919 (Tenn. 2009). We therefore conclude that Mr. Hatfield has waived his issue concerning the trial court's taxing of costs by failing to present supportive argument in his appellate brief.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in its entirety. Costs on appeal are taxed to the appellant, Mark Hatfield. This case is remanded to the trial court for enforcement of its judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE